## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COTTAGE HEALTH SYSTEM, d/b/a )
SANTA BARBARA COTTAGE HOSPITAL )
Pueblo at Bath Street )
Santa Barbara, California 93105, )
           )
           Plaintiff, ) Case No.: 1:08-cv-00098 (JDB)
           )
         v. )
           )
MICHAEL O. LEAVITT, Secretary )
United States Department of )
     Health and Human Services, )
200 Independence Avenue, S.W. )
Washington, DC 20201, )
           )
           Defendant. )
_____)

## AMENDED COMPLAINT FOR SUMS DUE AND FOR DECLARATORY
## AND INJUNCTIVE RELIEF UNDER THE MEDICARE ACT

### I. INTRODUCTION

1.    This is an action for judicial review of a final decision of the Secretary of the Department of Health and Human Services ("Secretary") denying Medicare payments to the plaintiff Hospital for costs incurred from 1998 through 2002 in connection with the Hospital's approved residency training programs. The Medicare payments at issue are payments for direct graduate medical education ("GME") costs and indirect medical education ("IME") costs. In administrative proceedings before the agency, the Secretary denied GME and IME payments both with respect to Hospital discharges of Medicare beneficiaries who were enrolled in certain Medicare managed care plans ("HMOs") and with respect to residents' required training in certain non-hospital settings. The Secretary's decision on both points is contrary to law and should be reversed.

2.    In 1997, Congress amended the Medicare statute to provide for IME and GME payments with respect to hospital discharges of Medicare beneficiaries enrolled in a Medicare HMO. Pub. L. No. 105-33, §§ 4622 and 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)). The 1997 legislation also required the Secretary to collect from the contracted Medicare HMO plans the data needed to make these payments to teaching hospitals. Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)). In contravention of those statutes, the Secretary denied the IME and GME payments at issue because he determined that the Hospital was late in furnishing unnecessarily duplicative claims for payment to the Secretary's "fiscal intermediary."

3.    In fact, though, the Hospital timely submitted claims for payment on the Secretary's prescribed claim forms to the Medicare HMO plans that enrolled the patients. Moreover, the HMOs submitted that same information on the same forms with respect to the same patients to the fiscal intermediary, before the intermediary rendered its final payment determination for the periods at issue. The Secretary nevertheless determined, incorrectly, that the Hospital should receive no IME and GME payments with respect to discharges of Medicare HMO patients because it did not submit the duplicate claims to the fiscal intermediary within a specific time period required under regulations that are expressly inapplicable when services are furnished, as in this case, on a prepaid capitation basis by a Medicare HMO. 42 C.F.R. § 424.30.

4.    The Secretary's decision is not only contrary to the controlling statutes and regulations he relied upon, but it is also invalid, and should be set aside, because it violates the public protections of the Paperwork Reduction Act. 44 U.S.C. § 3512(a). The Secretary did not obtain the required approval for the requirement, applied in this case, that hospitals submit

duplicate claims for payment not only to the Medicare HMOs that make payments to hospitals for services furnished to plan enrollees, but also to the Medicare fiscal intermediaries.  The public protection provision of the Paperwork Reduction Act, therefore, prohibits the Secretary from imposing any penalty upon, or withholding a benefit from, the Hospital due to its alleged failure to meet the Secretary's illegal requirement. Additionally, the Secretary's application of his triplicate billing requirement is arbitrary and capricious, and should be set aside, because the Secretary did not give the Hospital fair notice of such a requirement at a time when the Hospital could have met it.

5.    With respect to the second aspect of the issue in this case, Congress amended the Medicare Act in 1987 and again in 1997 to require the Secretary to make GME and IME payments, respectively, with regard to residents' training in non-hospital settings.   Congress amended the Act specifically to require the Secretary to count all residents' training in non-hospital settings subject to two statutory conditions precedent, which are not at issue in this case.

6.    In contravention of the plain meaning and manifest intent of those statutes, the Secretary denied the Hospital IME and GME payments because he determined that the Hospital failed to satisfy an additional condition, separate and apart from the statute's two conditions. Specifically, the Secretary determined that in addition to meeting the statutory conditions to IME and GME payments with respect to residents' training in non-hospital settings, the Hospital also must have a written agreement with a non-hospital "site" in order to receive the IME and GME payments with respect to residents' training in that setting.   The Secretary's adoption and application of the written agreement requirement in this case is beyond the Secretary's statutory authority and should be reversed.

7.    But, even if the Secretary's written agreement requirement were at least facially valid, the Secretary's application of that requirement in this case should be set aside for additional reasons.  First, the Secretary's refusal in this case to accept the Hospital's post-dated memoranda of understanding with the physicians who supervised the residents during their training in non-hospital settings conflicts with the plain language and intent of the regulations setting forth the written agreement requirement.  See 42 C.F.R. § 413.86(f)(3)-(4) (2002); 42 C.F.R. § 412.105(f)(1)(ii)(C) (2002).    When the written agreement requirement was first adopted in 1989 and made effective retroactively to 1987, the Secretary clearly did not intend to require a hospital to have contemporaneous written agreements in place before a resident's training in a particular non-hospital setting.

8.    Moreover, the agency previously construed its regulations to allow a hospital to satisfy the written agreement requirement with post-dated agreements, so long as the hospital had a commitment in place to incur all or substantially all of the costs of the residents' training in non-hospital settings.  The contemporaneous documents in the record show that the Hospital had such a commitment in place during the periods at issue.

9.    For all the foregoing reasons, the Secretary's final decision should be reversed. The Plaintiff requests that the Court direct the Secretary to make the IME and GME payments the Hospital seeks with respect to discharges of Medicare HMO patients and with respect to residents' training in non-hospital settings during the periods at issue.

## II. JURISDICTION AND VENUE

10.    This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

11.    Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

12.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

### III.  PARTIES

13.     The plaintiff is Cottage Health System, a not-for-profit corporation that owns and operates Santa Barbara Cottage Hospital, in Santa Barbara, California.   Santa Barbara Cottage Hospital (the "Hospital") participates in the Medicare program as a "provider of services" under Medicare provider number 05-0396.

14.     The Defendant is Michael O. Leavitt in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program.  References to the Secretary herein are meant to refer to him, his subordinates, and to his official predecessors or successors as the context requires.

15.     The Centers for Medicare and Medicaid Services ("CMS") is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program. At some times relevant to this case, CMS was known as the Health Care Financing Administration.  References to CMS herein are meant to refer to the agency and its predecessors.

### IV.  MEDICARE PAYMENT DETERMINATIONS AND APPEALS

A.     Medicare Part A

16.     This case concerns Part A of the Medicare Act, 42 U.S.C. §§ 1395c-1395i-4, which provides payment for "inpatient hospital services" furnished by participating "providers of services," like the Hospital in this case.  42 U.S.C. § 1395d(a)(1).

B.     Claims for Payment for Services Furnished to Medicare Beneficiaries

17.     Medicare Part A payments to hospitals are usually determined by fiscal intermediaries (usually private insurance companies) that contract with CMS under 42 U.S.C. § 1395h.

18.    The Medicare Part A fiscal intermediaries make payments to hospitals for inpatient services furnished to patients who are entitled to benefits under Medicare Part A and who are not enrolled in a Medicare HMO.  Interim payments are made by the intermediaries upon receipt of patient-specific claims submitted by hospitals on a CMS claim form, called the UB-92 form, within the time periods and subject to the requirements and procedures prescribed in Medicare regulations codified at 42 C.F.R. § 424.30 et seq.

19.    When a Medicare Part A beneficiary enrolls in a Medicare HMO, the Secretary pays the HMO on a prepaid capitation basis (an amount per enrollee) for items and services that are furnished to the Medicare HMO enrollee and are covered under Medicare Part A.  See 42 U.S.C. §§ 1395w-21(a)(1) and (i)(1), 1395mm(a)(1) and (a)(3); 42 C.F.R. §§ 417.524, 417.584 and 422.250.

20.    When a hospital provides services to a Medicare HMO enrollee, the hospital bills and receives payment from the HMO.

21.    The procedures, requirements and time periods for submission of Medicare Part A claims to the intermediaries do not apply "when services are furnished on a prepaid capitation basis by [Medicare HMOs]."  42 C.F.R. § 424.30.  See also St. Anthony's Health Center, CMS Adm'r Dec. (July 19, 2006), reprinted in MEDICARE & MEDICAID GUIDE (CCH) ¶ 81,547 (construing section 424.30 to mean "if an HMO company is responsible for paying the claim, hospitals do not have to submit a claim to the Fiscal Intermediary for payment.")

C.    Final Intermediary Payment Determinations

22.    The interim payments made by a Medicare Part A intermediary to a hospital (for services furnished to Medicare Part A beneficiaries who are not enrolled in a Medicare HMO)

are subject to a final aggregate payment determination made by the intermediary based upon its review of an annual cost report prepared by the hospital.

23.     After the close of a hospital fiscal year, the Medicare fiscal intermediary analyzes a cost report prepared by the hospital and issues a Notice of Program Reimbursement, or "NPR," that informs the hospital of the intermediary's final determination of the hospital's Medicare reimbursement for the period.     See 42 C.F.R. § 405.1803.     See also In Re: Medicare Reimbursement Litigation, Baystate Health System v. Thompson, 309 F. Supp.2d 89, 92 (D.D.C. 2004) ("Baystate").

D.     Review of Intermediary Payment Determinations

24.     A hospital is entitled to an appeal to the Provider Reimbursement Review Board ("PRRB" or "Board") if it is dissatisfied with an intermediary's determination in an NPR as to the amount of Medicare payment due the provider for a cost reporting period.   42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

25.     The PRRB is an administrative tribunal appointed by the Secretary. 42 U.S.C. § 1395oo(h).

26.     The final decision of the PRRB is subject to review by the Administrator of CMS pursuant to delegation of authority by the Secretary to the Administrator.   See 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875.

27.     The Secretary's final decision, as set forth either in a final decision of the Board or of the Administrator of CMS, may be reviewed in a civil action before this Court.  42 U.S.C. § 1395oo(f).

28.     This Court reviews the Secretary's final decision under the applicable provisions of the Administrative Procedure Act ("APA").   42 U.S.C. § 1395oo(f).

29.    The applicable provisions of the APA require the Court to set aside the Secretary's final decision if it is in excess of the Secretary's statutory authority, arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law.  5 U.S.C. § 706.

## V.    NATURE OF THE CASE

30.    The periods at issue are the Hospital's cost reporting periods ending December 31, 1998, December 31, 1999, December 31, 2000 and December 31, 2001.

31.    During the cost reporting periods at issue, the Hospital operated three medical residency training programs, including an internal medicine program, accredited by the Accreditation Council on Graduate Medical Education ("ACGME").  Tr. at 54-55[1].

32.    At all relevant times, the Hospital incurred, and received Medicare reimbursement for, two types of costs in connection with its medical residency training programs.    These costs are referred to as direct graduate medical education ("GME") costs and indirect medical education ("IME") costs.

33.    In appeals to the PRRB the Hospital presented two challenges to a Medicare fiscal intermediary's final payment determinations regarding the IME and GME payments due the Hospital for the cost reporting periods at issue.

34.    The Hospital first challenged the fiscal intermediary's denial of GME and IME payments with respect to Hospital discharges of Medicare beneficiaries who were enrolled in (i) a health maintenance organization or competitive medical plan with a Medicare risk sharing contract under section 1876 of the Social Security Act ("the Act") or (ii) a M+C plan under Part

---

[1] References herein to Provider Exhibits or the transcript of the hearing before the board are meant to refer to the record below.

C of the Act. For ease of reference, all of these organizations are collectively referred to herein as "Medicare HMOs."

35.    The Hospital also challenged the fiscal intermediary's denial of GME and IME payments with respect to Hospital residents' who spent time training in non-hospital settings.

36.    After a hearing, the Board issued a decision dated September 27, 2007.

37.    The PRRB reversed the intermediary's denial of IME and GME payments with respect to Hospital discharges of Medicare HMO enrollees and affirmed the intermediary's denial of payment with respect to residents' time spent training in non-hospital settings.

38.    Upon review of the Board's decision, the Deputy Administrator of CMS reversed the Board's decision overturning the denial of payments with respect to Medicare HMO enrollees and summarily affirmed the Board's decision denying payments with respect to residents' training in non-hospital settings.

39.    The Deputy Administrator's decision constitutes the Secretary's final determination on the two issues in dispute for the cost reporting periods at issue.

40.    The Deputy Administrator's decision was sent to the Hospital's counsel under cover of a letter dated November 21, 2007.

41.    The Hospital's counsel received that letter and the accompanying decision of the Deputy Administrator on November 26, 2007.

## VI. GENERAL RULES GOVERNING PAYMENTS FOR IME AND GME

A.    <u>IME Payment Calculation</u>

42.    Medicare pays most hospitals, including the plaintiff Hospital, under a prospective payment system for the operating costs of inpatient hospital services furnished to

Medicare Part A beneficiaries who are not enrolled in a Medicare HMO. 42 U.S.C. § 1395ww;

42 C.F.R. Part 412. See also Baystate, 309 F. Supp.2d at 92.

43.    Under the prospective payment system for operating costs, Medicare pays

predetermined, standardized amounts per discharge, subject to certain hospital-specific payment

adjustments to the standardized payment rates. See 42 U.S.C. § 1395ww; 42 C.F.R. Part 412.

44.    One of the adjustments to the standard payment rates under the prospective

payment system is for IME costs. See 42 U.S.C. § 1395ww(d)(5)(B); 42 C.F.R. § 412.105.

45.    The IME payment add-on to the standard prospective payment system rates is

intended to compensate teaching hospitals for higher-than-average operating costs per discharge

that are statistically correlated with the hospital's intensity of teaching. See Riverside Methodist

Hospital v. Thompson, 2003 U.S. Dist. LEXIS 15163 (S.D. Ohio 2003).

46.    A teaching hospital's IME payment adjustment for a fiscal year is determined by

the Medicare Part A intermediary through the year-end cost report process.

47.    The IME payment calculation is based, in part, on the ratio of a hospital's number

of full-time equivalent residents who were training in approved training programs during a

hospital cost reporting period to the hospital's number of beds in the cost reporting period. See

42 U.S.C. § 1395ww(d)(5)(B)(ii); 42 C.F.R. § 412.105(a)(1).

48.    The resident-to-bed ratio serves as a proxy measure in the IME payment formula

for a hospital's teaching intensity. See Riverside Methodist Hospital v. Thompson, 2003 U.S.

Dist. LEXIS 15163 (S.D. Ohio 2003).

49.    Under the IME payment formula, the greater a hospital's full-time equivalent

number of residents, the greater the IME payment; and, conversely, deductions from a hospital's

number of residents decrease the IME payment to the hospital.

50.    Until January 1, 1998, the only other variable term in the IME payment calculation consisted of the aggregate amount of the standard payments made to a hospital under the prospective payment system for operating costs of inpatient hospital services furnished to Medicare Part A beneficiaries who were not enrolled in a Medicare HMO during the hospital's cost reporting period.    See 42 U.S.C. §§ 1395ww(d)(5)(B)(i) and (d)(11);    42 C.F.R. §§ 412.105(a)(2) and (g).

51.    Beginning on January 1, 1998, and throughout the cost reporting periods at issue, the IME payment calculation also considers estimated average payments per discharge that would have been paid under the prospective payment system for hospital discharges of Medicare beneficiaries who were enrolled in a Medicare HMO when they received services from the hospital.    42 U.S.C. § 1395ww(d)(11); 42 C.F.R. §§ 412.105(g).

52.    The additional IME payments provided with respect to teaching hospitals' discharges of Medicare HMO enrollees were to be phased in gradually over a five-year period in which like amounts were to be removed from the capitation rates paid by the Secretary to the Medicare HMOs.    See 42 U.S.C. §§ 1395ww(d)(11)(C), 1395ww(h)(3)(D)(ii); 1395w-23(a)(3)(B)-(C); see also 42 C.F.R. § 422.254(c) and (e)(2).

B.    GME Payment Calculation

53.    The prospective payment system for the operating costs of inpatient hospital services does not apply to the costs of approved residency training programs, which are referred to as GME costs.    See 42 U.S.C. § 1395ww(a)(4); 42 C.F.R. §§ 412.1(a)(1) and (f)(7).

54.    A separate payment for a teaching hospital's GME costs for a fiscal year is determined by the Medicare Part A intermediary through the year-end cost report process.

55.    During the periods at issue, the Medicare payment to a teaching hospital for GME costs was calculated on the basis of a fixed hospital-specific average per resident amount for GME costs, times the hospital's allowable number of full-time equivalent residents in approved training programs, times the hospital's percentage of total patient days attributable to individuals who were either entitled to have payment made under Medicare Part A or were enrolled in a Medicare HMO.   See U.S.C. § 1395ww(h); 42 C.F.R. 413.86(d) (2002).

56.    Under the GME payment calculation, the greater a hospital's full-time equivalent number of residents, the greater the GME payment; and, conversely, deductions from a hospital's number of residents decrease the GME payment to the hospital.

57.    Similarly, under the GME payment calculation, the greater a hospital's percentage of Medicare patient days in proportion to its total number of patient days, the greater the GME payment; and, conversely, reductions to a hospital's number of Medicare patient days in proportion to total patient days decrease the GME payment to the hospital.

58.    For periods before 1998, the GME payment calculation did not provide for payment with respect to patient days associated with Medicare beneficiaries who were enrolled in Medicare HMOs because these days were not counted as Medicare days in the GME payment calculation described above.   See 42 C.F.R. §§ 413.86(b) and (d); see also 54 Fed. Reg. 40286, 40294-95 (Sept. 29, 1989).

59.    Beginning on January 1, 1998, and throughout the cost reporting periods at issue, the GME payment calculation provides for additional GME payment to a teaching hospital with respect to patient days associated with Medicare beneficiaries who are enrolled in Medicare HMOs.   See 42 U.S.C. § 1395ww(h)(3)(D)(i)(II); 42 C.F.R. § 413.86(d).

60.    Congress directed that the additional GME payments made with respect to hospitals' Medicare HMO patient pays were to be phased in gradually over a five-year period in which like amounts were to be removed from the capitation rates paid by the Secretary to the Medicare HMOs.  See 42 U.S.C. §§ 1395ww(d)(11)(C), 1395ww(h)(3)(D)(ii); 1395w-23(a)(3)(B)-(C); see also 42 C.F.R. § 422.254(c) and (e)(2).

## VII.  DENIAL OF IME AND GME PAYMENTS WITH RESPECT TO MEDICARE HMO PATIENTS

A.    Statutes, Regulations and Agency Guidance Concerning IME and GME Payments With Respect to Medicare HMO Enrollees

1997 Legislation

61.    In the Balanced Budget Act of 1997, Congress amended the Medicare statute, as described above, to provide for the additional IME and GME payments, phased in over a five-year period beginning on January 1, 1998, with respect to hospital inpatients who are enrolled in Medicare HMOs.    Pub. L. No. 105-33, §§ 4622 and 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)).

62.    In the same 1997 legislation, Congress directed the Secretary to require the Medicare HMO contractors to submit data, and any other information the Secretary deemed necessary, regarding inpatient hospital services furnished to Medicare HMO enrollees.  Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)).

August 1997 Rule

63.    In the preamble to a final rule published in the Federal Register on August 29, 1997, the Secretary acknowledged that Congress had amended the Medicare Act to provide for IME and GME payments with respect to Medicare HMO enrollees, that Congress required the Secretary to collect necessary data from the contracted HMOs to implement adjustments to the

capitation rates paid to them, and that the agency was "considering the data requirements necessary to implement both the direct and indirect medical education and [Medicare HMO] risk adjustment provisions."  62 Fed. Reg. 45965, 46007

May 1998 Rule

64.    In the preamble to a final rule published in the Federal Register on May 12, 1998, the Secretary stated:    "We anticipate teaching hospitals will need to submit claims associated with Medicare+Choice discharges to the fiscal intermediaries for purposes of receiving indirect and direct medical education payments."    63 Fed. Reg. 26318, 26342.    The Secretary did not adopt such a requirement in that rule.

June 1998 Rule

65.    On June 26, 1998, CMS published notice of an interim final rule in the Federal Register, and adopted a regulation, requiring Medicare HMOs to submit hospital encounter data to the Medicare fiscal intermediaries for each HMO's own enrollees.  63 Fed. Reg. 34968, 35092 (June 26, 1998).  The regulation, codified at 42 C.F.R. § 422.257(a), states:

> Each M+C organization must submit to CMS (in accordance with CMS instructions) all data necessary to characterize the context and purposes of each encounter between a Medicare enrollee and a provider, supplier, physician, or other practitioner.

66.    The June 1998 rule further provides that the HMOs' submission of this data to the Medicare fiscal intermediaries must "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate." 42 C.F.R. § 422.257(d).

67.    The Secretary further clarified in the preambles to the 1998 interim final rule and a later rule that the HMOs were required to submit hospital encounter data to the fiscal intermediaries on the same form (UB-92) and in a format that is "identical" to the form and format of hospital  claims for payment to the intermediaries, because "pricing of discharges" of

14

Medicare HMO enrollees would be required to recalibrate the capitation payments made by CMS to the HMOs. 63 Fed. Reg. at 35006; 65 Fed. Reg. 40170, 40249 (June 29, 2000).

<u>July 1998 Program Memorandum to Intermediaries (A-98-21)</u>

68.    In July 1998, CMS issued a program memorandum regarding the provision for additional GME and IME payments with respect to discharges of hospitals patients enrolled in Medicare HMOs. Program Memorandum (Intermediaries), HCFA Pub. 60-A, Trans. No. A-98-21 (Jul. 1, 1998), Provider Exhibit 24.

69.    The July 1998 program memorandum was addressed to the Medicare fiscal intermediaries. The memorandum principally addressed "intermediary and standard system changes needed" to provide IME and GME payments with respect to Medicare HMO enrollees. *Id.*

70.    The program memorandum instructed the fiscal intermediaries to notify providers that:  "Teaching hospitals may submit bills for inpatient stays by managed care enrollees for payment of IME." *Id.*

71.    The July 1998 program memorandum did not instruct the intermediaries to give hospitals notice that they must submit claims to the intermediary in order to receive IME or GME payments with respect to hospital discharges of Medicare HMO enrollees.

72.    The July 1998 program memorandum also did not instruct the intermediaries to give hospitals notice as to any required time period for submission of claims to the intermediaries in order to receive IME or GME payments with respect to hospital discharges of Medicare HMO enrollees.

73.    The July 1998 program memorandum was not published in the Federal Register.

Intermediary's 1998 Newsletter Bulletin

74.    Following the issuance of CMS' July 1998 memorandum, discussed above, the Hospital's fiscal intermediary issued a newsletter, entitled "Medicare Bulletin 416," addressing among other things IME payments with respect to Medicare HMO enrollees.  Provider Exhibit 17.

75.    The portion of the newsletter addressing payment for "IME Costs" comprised less than one quarter of a page of the newsletter.

76.    The newsletter did not discuss GME payments.

77.    The first sentence of the portion of the newsletter addressing payments for IME said that "beginning with discharges on or after July 1, 1998, providers may not submit HMO paid claims (no pay bills) to their intermediary."  (Emphasis added.)

78.    In apparent contradiction with the first sentence, the second sentence of the newsletter's discussion of IME payments said:  "Teaching hospitals may submit bills for inpatient stays by managed care enrollees for payment of IME."

79.    The newsletter did not say that hospitals were required to submit claims to the Medicare Part A intermediary in order to receive IME payment with respect to Medicare HMO enrollees.  The newsletter also did not address any required time period for submission of claims to the Part A intermediaries.

80.    The newsletter reasonably could be read to mean that encounter data (or bills) concerning hospital discharges of Medicare HMO enrollees may not be submitted by a hospital to the Part A fiscal intermediaries but hospitals can submit their bills to the Medicare HMOs and receive IME payments as a result.

June 2000 Rule

81.     In the preamble to a final rule published in the Federal Register on June 29, 2000, the Secretary responded to comments regarding the June 1998 interim final rule, discussed above, and the submission of encounter data regarding hospital discharges of Medicare HMO enrollees.  65 Fed. Reg. 40170, 40249.

82.     In his response to those comments, the Secretary acknowledged a "range of problems in the submission of encounter data," including intermediary processing problems and confusion regarding hospital submission of encounter data.  65 Fed. Reg. at 40249.

83.     In order to address some of those problems, the June 2000 rule established a retrospective reconciliation process for encounter data that was submitted late by the Medicare HMOs to the Part A fiscal intermediaries.  See 65 Fed. Reg. at 40250; see also 42 C.F.R. § 422.257(g)(2).

84.     This reconciliation process was established to allow the HMOs the benefit of appropriately recalibrated capitation payment rates that take into account all the relevant available encounter data concerning hospital discharges of Medicare HMO enrollees, including data that was untimely submitted by the HMOs to the fiscal intermediaries.  See 65 Fed. Reg. at 40250.

February 2003 Program Memorandum (A-003-007)

85.     In February 2003, CMS issued a program memorandum concerning GME payments with respect to Medicare HMO enrollees who are treated by certain hospitals that are exempt from the prospective payment system.  Program Memorandum, Trans. No. A-03-007 (Feb. 3, 2003), Provider Exhibit 25.

86.    The February 2003 memorandum acknowledged that CMS' prior guidance had failed to address how the agency would make GME payments with respect to Medicare HMO patients of hospitals that are exempt from the prospective payment system.

87.    The February 2003 memorandum stated that these hospitals "must submit claims to their regular intermediary in UB-92 format" to obtain GME payments with respect to Medicare HMO patients, but this requirement was made effective only prospectively beginning July 1, 2003.

88.    The February 2003 memorandum also stated that GME payments to these hospitals with respect to Medicare HMO patients in prior periods would be addressed by the agency "in a separate issuance," which, on information and belief, was never published anywhere if it was ever issued at all.

B.    Facts Specific to the Denial of IME and GME Payments With
      Respect to Hospital Discharges of Medicare HMO Enrollees

89.    By letter dated July 17, 1998, the Hospital asked its fiscal intermediary for guidance as to the implementation of the 1997 legislation that provided for GME and IME payments with respect to discharges of Medicare HMO enrollees.  Provider Exhibit 15.

90.    The Intermediary replied to the Hospital's request for guidance by letter dated August 20, 1998, stating that the Intermediary still needed to make "[s]ystem changes" and a "system enhancement" in order to implement the new law regarding payments for IME and GME.  Provider Exhibit 16.

91.    The fiscal intermediary's August 20, 1998 letter also referenced the intermediary's newsletter, "Medicare Bulletin 416," which issued in July 1998.

92.    By letter dated November 2, 2000, the Hospital furnished the Medicare Part A fiscal intermediary with encounter data for Hospital discharges of Medicare patients who were

enrolled in a Medicare HMO during the Hospital's cost reporting period ending December 31, 1998.  Provider Exhibits 5 and 6.

93.    The November 2, 2000 letter explained that the fiscal intermediary's data, which had been furnished to the Hospital for inclusion in its Medicare cost report for the 1998 period, did not include the encounter data for these Hospital discharges.

94.    The November 2, 2000 letter further advised the fiscal intermediary that the UB-92 forms for each of these Medicare HMO patient discharges had been timely submitted to and paid by the Medicare HMOs and would be available for the fiscal intermediary's review during its later audit of the Hospital's cost report for 1998.

95.    Months later, by letter dated April 13, 2001, the fiscal intermediary scheduled an audit of the Hospital's cost report for 1998.  Provider Exhibit 7.

96.    After completion of that audit, the fiscal intermediary accepted the Hospital's encounter data and made a GME payment to the Hospital with respect to its discharges of Medicare HMO enrollees in the intermediary's final payment determination for the Hospital's 1998 cost reporting period.  Provider Exhibits 8 and 9.

97.    Subsequently, in a revised NPR dated February 14, 2003, the fiscal intermediary amended the previously-settled cost report for 1998 by removing the statistics relating to the Hospital's discharges of Medicare HMO enrollees in 1998.  Provider Exhibit 10.   The fiscal intermediary did not include the encounter data for the Hospital's discharges of Medicare HMO enrollees in its revised, final determination of the IME and GME payments due the Hospital for its 1998 cost reporting period.

98.    By letter dated March 27, 2002, the Hospital furnished the fiscal intermediary with encounter data for discharges of Medicare risk plan patients in fiscal year 1999.  Provider Exhibits 8 and 11.

99.    The March 27, 2002 letter stated:  "We have been working with [the fiscal intermediary's] office to find out why these senior HMO days are not getting into [the intermediary's data in a report called a "PS&R"].   During the audit of FY 1998, [the intermediary's] staff incorporated this information at the time of audit.  For FY 1999, again this information was not in the PS&R."  Provider Exhibit 8.

100.    The March 27, 2002 letter further advised the fiscal intermediary that all of the "Senior HMO" encounter data for the Hospital's 1999 cost reporting period "have been logged from the UB92 that we sent the [Medicare HMO] plans" and the Hospital had copies of the UB-92 forms available for each case in the log.   Provider Exhibit 8.

101.    By letter dated April 9, 2002, the fiscal intermediary notified the Hospital that the intermediary would begin an audit of the Hospital's cost report for 1999 on May 9, 2002. Provider Exhibit 12.

102.    By letter dated June 10, 2003, the Hospital furnished the fiscal intermediary with a listing of its "Senior HMO" patients for its 2000 cost reporting period.  Provider Exhibits 13 and 14.  The Hospital again requested that this encounter data be included in the fiscal intermediary's forthcoming settlement and final determination of the amounts due the Hospital for its 2000 cost reporting period.

103.    The fiscal intermediary ultimately refused to accept or include the Hospital's encounter data concerning the discharges of Medicare HMO enrollees in its final IME and GME payment determinations for any of the 1998-2001 cost reporting periods at issue.

## VIII.  SECRETARY'S DENIAL OF IME AND GME PAYMENTS WITH RESPECT TO RESIDENTS' TRAINING IN NON-HOSPITAL SETTINGS

A.  <u>Statutes, Regulations and Agency Guidance Regarding IME and GME Payments With Respect to Residents' Training in Non-Hospital Settings</u>

104.    The GME and IME statutes provide that the resident counts for GME and IME must include all residents' time spent training in an approved program in a non-hospital setting if two conditions are met: (1) the residents' time is related to patient care, and (2) the hospital incurs substantially all of the costs of the residents' training in the non-hospital setting.  <u>See</u> 42 U.S.C. §§ 1395ww(h)(4) and 1395ww(d)(5)(B)(iv).

105.    The Medicare regulations add a third condition precedent to the statute's two conditions for counting residents' training in a non-provider setting.    <u>See</u> 42 C.F.R. § 413.86(f)(3)-(4) (2002); 42 C.F.R. § 412.105(f)(1)(ii)(C) (2002).

106.    The regulations' third regulatory condition is that a hospital must have a written agreement with the "nonhospital site" indicating that the hospital will incur the costs of the residents' training in that setting and is providing reasonable compensation to the "site" for supervisory teaching activities.  42 C.F.R. § 413.86(f)(3)-(4) (2002); 42 C.F.R. § 412.105(f)(1)(ii)(C) (2002).

107.    The regulations imposing the written agreement requirement do not address the required timing of a written agreement between a hospital and non-hospital "site."  42 C.F.R. §§ 413.86(f)(3)-(4) (2002); 42 C.F.R. § 412.105(f)(1)(ii)(C) (2002).

108.    When the Secretary first adopted the written agreement requirement in 1989, he necessarily intended to permit post-dated agreements because the 1989 rule was made effective retroactively to 1987.  <u>See</u> 54 Fed. Reg. 40286, 40317 (Sept. 29, 1989) (final rule adding § 413.86(f)(1)(iii)).

109.    In a November 2000 letter to Congressman Rangel, the Administrator of CMS clarified that a post-dated, non-contemporaneous agreement may be accepted to count residents' time spent training in a non-hospital setting so long as a hospital can establish that it had "a commitment to incur the training costs before the time that the residents began training" in the non-hospital setting.  Provider Exhibit 43.

110.    Subsequently, in the preamble to a final rule promulgated in 2004, the Secretary further clarified that the written agreement requirement was intended only "to provide an administrative tool for use by the fiscal intermediaries to assist in determining whether hospitals would incur all or substantially all of the costs of the training in the non-hospital setting in accordance with Congressional intent."  See 69 Fed. Reg. 48916, 49179 (Aug. 11, 2004).

111.    In the preamble to the 2004 rule, the Secretary acknowledged that "the regulatory requirements concerning the written agreements may not have been the most efficient aid to fiscal intermediaries in determining whether hospitals would actually incur all or substantially all of the costs of the training programs in non-hospital settings."  69 Fed. Reg. at 49179.

112.    Following the 2004 amendments to the IME and GME regulation, no written agreement is required to count residents' time spent training in a non-hospital setting if a hospital pays for the costs of residents' training in non-hospital settings within three months after the month in which such training occurs.  See 42 C.F.R. § 413.78(e)(3)(i) (2005).

113.    In the preamble to 1998 rule on this subject, and in subsequent program instructions, the Secretary said that the determination of the cost of residents' training in a non-hospital setting is "a matter between the hospital and nonhospital site."  See 63 Fed. Reg. 40954, 40993 (July 31, 1998); see also Program Memorandum A-98-44 (Dec. 1, 1998) (stating that "the determination of what constitutes reasonable compensation is a matter between the hospital and

non-hospital site…. We do not expect fiscal intermediaries to do a detailed cost finding as to each party's respective costs.")

114.    In the preamble to the 1998 rule and in the later program instructions, the Secretary also said that a hospital may provide non-monetary, in-kind consideration for physician supervision of residents in a non-hospital setting, and the value of such in-kind consideration need not be identified in an agreement between the parties. See 63 Fed. Reg. at 40993; see also Program Memorandum A-98-44.

115.    Additionally, in the preamble to the 1998 rule and in a later rulemaking, the Secretary said that teaching physicians can volunteer their teaching services to a hospital. 63 Fed. Reg. at 40996; 64 Fed. Reg. 41490, 41517 (July 30, 1999).

B.    Facts Specific to the Denial of IME and GME Payments
With Respect to Residents' Training in Non-Provider Settings

116.    The Hospital's residency training program in internal medicine is an approved program that is accredited by the Accreditation Council on Graduate Medical Education ("ACGME"). Tr. at 54-55.

117.    The ACGME requires that at least one-third of the residents' training in an accredited internal medicine program must take place in physician offices and other ambulatory care settings outside of a hospital. Provider Exhibit 33 at 19; Tr. at 55-58.

118.    The Hospital's residents spent time training in non-hospital settings under the supervision of teaching physicians in the community who are admitted members of the Hospital's medical staff. Tr. at 56.

119.    The Hospital employed the residents and paid the full amount of their salaries and benefits, including the compensation costs attributable to residents' time spent training in non-hospital settings. Provider Exhibit 41; Tr. at 72.

120.    The residents received no payment or other compensation of any kind from the teaching physicians or other entities.  Tr. at 72.

121.    The residents' instruction during their rotations to non-hospital settings followed an apprenticeship model.  Tr. at 58.

122.    During these rotations, each resident typically worked with a physician, who either saw patients right after a resident saw them, or jointly examined the patient together with the resident.    The teaching physicians were not required or expected to give lectures or engage in any other didactic activities to meet curriculum requirements during  residents' rotations to non-hospital settings.  Tr. at 62.

123.    The teaching physicians spent substantially all of their time in patient care activities while supervising residents during their rotations to non-hospital settings.  Tr. at 62-63, 67, 69-72, Provider Exhibit 36.

124.    The teaching physicians were not compensated monetarily for their supervision of the residents during residents' rotations to the non-hospital settings at issue.  Tr. at 76-80, Provider Exhibit 36.

125.    As admitted members of the Hospital's medical staff, the teaching physicians were required to "aid[] in any medical staff approved educational programs for medical students, interns, resident physicians, resident dentists, staff physicians and dentists, nurses and other personnel." Provider Exhibit 37, Art. II, § 2.5(G).

126.    As admitted members of the Hospital's medical staff, the physicians also were granted clinical admitting privileges at the Hospital.  Tr. at 73-76.

127.    Upon admission to the Provider's medical staff, each physician executes an agreement to abide by certain terms and conditions, as set forth in the Bylaws of the Medical Staff of the Hospital.  Provider Exhibit 37; Tr. at 81.

128.    Until it effected the adjustments at issue, the Secretary's fiscal intermediary had consistently counted residents' time spent in non-hospital settings in the resident counts used to determine the Hospital's payments for GME and IME.  Tr. at 84.

129.    The fiscal intermediary first excluded the residents' time spent in non-hospital settings in an NPR dated August 30, 2002 for the Hospital's cost reporting period that ended December 31, 1999.

130.    The intermediary determined that the Hospital did not have adequate written agreements in place with the teaching physicians concerning the costs of the residents' training during their non-hospital rotations during the 1999 cost reporting period.  The Intermediary made that determination after the December 31, 2001 year end of the latest cost reporting period at issue in this case.

131.    In response to the intermediary's determinations for the periods at issue, the Hospital and the teaching physicians on its medical staff entered into memoranda of understanding in 2005 which restated and clarified the terms of their pre-existing agreement concerning residents' training during their rotations to non-hospital settings.  Tr. at 81-82; Provider Exhibit 38.

132.    The memoranda of understanding confirm the agreement that the Hospital bears substantially all of the costs of the residents' training during rotations to the physicians' offices or clinics.  Provider Exhibit 38.

133.    The memoranda of understanding also confirm the agreement that clinical privileges and other rights granted to the physicians under the Medical Staff Bylaws constitute fair and reasonable in-kind compensation for the supervision and instruction of interns and residents during their rotations to non-hospital settings.    Provider Exhibit 38.

## IX.  ASSIGNMENT OF ERRORS

134.    The Secretary's final decision below should be set aside because it is contrary to law, arbitrary and capricious, and not based upon substantial evidence in the record.  See 42 U.S.C. § 1395oo(f); 5 U.S.C. § 706.

135.    The Secretary's denial of IME and GME payments with respect to Hospital discharges of Medicare HMO enrollees should be set aside for the following reasons:

A.    The Secretary's denial is inconsistent with the 1997 legislation providing for such payments to be made to teaching hospitals like the plaintiff Hospital and requiring the Secretary to collect from the Medicare HMOs the encounter data needed to properly make those payments to teaching hospitals.  Pub. L. No. 105-33, §§ 4001, 4622 and 4624 (codified at 42 U.S.C. §§ 1395w-23(a)(3)(B), 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)).

B.    The Secretary's denial also is inconsistent with the plain language and intent of the regulations establishing procedures and time periods for submission of claims for payment to the Medicare Part A intermediaries in all cases except when services are furnished on a prepaid capitation basis by a Medicare HMO.   42 C.F.R. § 424.30.

C.    The Secretary's interpretation of the aforementioned regulations in his final decision below also is invalid because (i) it represents an unexplained departure from agency precedent interpreting those regulations as not applying to services furnished on a prepaid capitation basis by a Medicare HMO, St. Anthony's Health Center, CMS Adm'r Dec. (July 19,

2006), reprinted in MEDICARE & MEDICAID GUIDE (CCH) ¶ 81,547; and (ii) the agency did not invoke the notice and comment rulemaking procedures mandated by the APA in adopting the contrary interpretation of the rule that was applied in the final decision in this case.

   D.    The Secretary's denial and the program instructions he relied upon also violate the public protection provision of the Paperwork Reduction Act, 44 U.S.C. § 3512(a), and are otherwise arbitrary and capricious, because the Secretary did not obtain the required approval for a new requirement that teaching hospitals must submit unnecessarily duplicative payment claims both to Medicare HMOs and to Medicare Part A fiscal intermediaries in order to receive the IME and GME payments due under the Medicare Act.

   E.    In addition, the Secretary's denial is otherwise arbitrary, capricious and otherwise contrary to law because the Hospital was not given fair notice of a requirement to submit duplicate bills both to Medicare HMOs and Medicare Part A intermediaries in order to receive the IME and GME payments due under the Medicare Act, and, in the circumstances presented, the Secretary should have waived the claims filing requirements he says were applicable here.

   136.    The Secretary's denial of IME and GME payments with respect to residents' training in non-hospital settings should be set aside for the following reasons:

   A.    The Secretary's denial of payment and the written agreement requirement he relied upon are inconsistent with the plain meaning and manifest intent of the statutory provisions requiring the Secretary to include all residents' time spent training in non-hospital settings in the IME and GME payment calculations if the residents in approved programs are involved in patient activities and the hospital incurs substantially all of the costs of the residents' training in the non-hospital setting. 42 U.S.C. §§ 1395ww(h)(4) and 1395ww(d)(5)(B)(iv).

B.    The Secretary's refusal to accept the Hospital's post-dated memoranda of understanding with the physicians who supervised the residents while in training in non-hospital settings conflicts with the plain language and intent of the regulations setting forth the written agreement requirement.  42 C.F.R. § 413.86(f)(3)-(4) (2002); 42 C.F.R. § 412.105(f)(1)(ii)(C) (2002).

C.    The Secretary's refusal to accept the Hospital's memoranda of understanding with the physicians also is not based upon substantial evidence in the record, and is inconsistent with agency precedent interpreting written agreement requirement, because contemporaneous Hospital records reflect that the Hospital had a commitment to incur all or substantially all of the costs of the residents' training in non-hospital settings during the cost reporting periods at issue.

## X. REQUEST FOR RELIEF

137.    WHEREFORE, the plaintiff Hospital requests an Order:

A.    declaring invalid the Secretary's final decision denying the Hospital IME and GME payments with respect to discharges of Medicare HMO enrollees and with respect to residents' training in non-hospital settings;

B.    reversing the Secretary's final decision and requiring the Secretary promptly to pay the Hospitals all sums due as a result of the reversal of that decision, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

C.    requiring the Secretary to pay legal fees and costs of suit incurred by the Hospital; and

D.    providing such other relief as the Court may consider appropriate.

Respectfully submitted,

Christopher L. Keough (lead)
 DC Bar No. 436567
Stephanie A. Webster
 DC Bar No. 479524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated: February 13, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Amended Complaint For Sums Due and For Declaratory and Injunctive Relief Under the Medicare Act has been served on Defendant on this the 13th day of February 2008, as follows:

Civil Process Clerk *(By hand delivery)*
U.S. Attorney for the District of Columbia
555 Fourth Street, N.W.
Washington, DC 20530

Michael O Leavitt, Secretary *(By certified U.S. Mail)*
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

U.S. Attorney General *(By certified U.S. Mail)*
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Christopher L. Keough
DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)