**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COTTAGE HEALTH SYSTEM, d/b/a | ) |
| SANTA BARBARA COTTAGE HOSPITAL, | ) |
| | ) |
| Plaintiff, | ) Case No.: 1:08-cv-00098 (JDB) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL O. LEAVITT, Secretary | ) |
| United States Department of | ) |
| Health and Human Services, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff respectfully moves for summary judgment in its favor on the grounds that there are no material facts in dispute and that Plaintiff is entitled to judgment as a matter of law. In support of this motion, the Court is respectfully referred to the accompanying Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment and Plaintiff's Statement of Material Facts As to Which There Is No Genuine Issue. A proposed order setting forth the relief requested by this motion is also attached.

Respectfully submitted,

/s/ Christopher L. Keough
Christopher L. Keough
   DC Bar No. 436567
J. Harold Richards
   DC Bar No. 469524
KING & SPALDING L.L.P.
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006-2706
202.737.0500 (phone)
202.626.3737 (fax)

Counsel for Plaintiff

Dated: July 11, 2008

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COTTAGE HEALTH SYSTEM, d/b/a    )
SANTA BARBARA COTTAGE HOSPITAL,    )
    )
        Plaintiff,    )  Case No.: 1:08-cv-00098 (JDB)
    )
        v.    )
    )
MICHAEL O. LEAVITT, Secretary    )
United States Department of    )
   Health and Human Services,    )
    )
        Defendant.    )
_____)

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Christopher L. Keough
  DC Bar No. 436567
J. Harold Richards
  DC Bar No. 469524
KING & SPALDING L.L.P.
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006-4706
202.737.0500 (phone)
202.626.3737 (fax)

Counsel for Plaintiff

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

I. STANDARD OF REVIEW ............................................................................ 2

II. GENERAL BACKGROUND........................................................................ 4

   A. MEDICARE PARTS A THROUGH D .............................................. 4

   B. BILLING AND PAYMENTS UNDER MEDICARE'S PART A FEE-FOR-SERVICE PROGRAM AND UNDER MEDICARE PART C................................... 5

   C. TWO PAYMENTS UNDER PARTS A AND C FOR BOTH IME AND GME ......... 7

      1. The IME Payment Under the Part A Fee-For-Service Program ......... 7

      2. The GME Payment Under the Part A Fee-For-Service Program ........ 8

      3. 1997 Legislation Requiring IME and GME Payments for Services Furnished to Medicare HMO Enrollees Under Part C ........................ 8

      4. Relevance of Resident Counts and Medicare HMO Patient Utilization Statistics in the GME and IME Payment Calculations At Issue ....................... 10

III. FIRST ISSUE ................................................................................................ 11

   A. FACTS SPECIFIC TO THIS ISSUE.......................................................... 11

      1. Legal Authorities and Agency Guidance Regarding Submission of Patient Encounter Data for Hospital Services Furnished to Medicare HMO Enrollees ................................................................. 11

         a. Implementing Regulations ......................................................... 12
         b. Program Instructions to Intermediaries.................................... 13

      2. Medicare HMO Patient Encounter Data Submitted in this Case....................... 15

      3. Decisions Below ............................................................................. 16

   B. ARGUMENT ............................................................................................ 18

      1. The Administrator's Decision is Inconsistent with the Plain Language of the Controlling Statutes and Regulations ...................................... 20

      2. The Secretary's Duplicate Billing Requirement for Services Furnished to Medicare HMO Patients Is Unenforceable Under the Paperwork Reduction Act Because It is an Unapproved and Invalid Reporting Requirement............ 24

      3. As the Secretary's Board Found, the Hospital Was Not Afforded Fair Notice of Any Requirement to Submit Encounter Data or Claims Directly to the Medicare Intermediary for Services Furnished to Medicare HMO Enrollees ................................................................. 27

i

# TABLE OF CONTENTS (CONT.)

IV.   SECOND ISSUE ....................................................................................................... 31

    A.   FACTS SPECIFIC TO THIS ISSUE......................................................................... 31

        1.   Legal Authorities and Agency Guidance Regarding IME and GME
            Payments With Respect to Residents' Training in Non-hospital Sites.............. 31

        2.   The Disallowances At Issue Here....................................................... 32

    B.   ARGUMENT ........................................................................................................ 34

        1.   The Secretary's  Application of His Written Agreement Requirement
            Violates the Medicare Statute .............................................................. 35

        2.   The Regulation that the Secretary Relies Upon Does Not Require a
            Prospective Written Contract ............................................................... 38

V.   CONCLUSION.......................................................................................................... 45

# TABLE OF AUTHORITIES

CASES

Alaska Prof'l Hunters Ass'n, Inc. v. FAA,
    177 F.3d 1030 (D.C. Cir. 1999) .........................................................................................23

Am. Petroleum Institute v. U.S. EPA,
    52 F.3d 1113 (D.C. Cir. 1995) ...........................................................................................38

Ass'n of Civilian Technicians, Montana Air Chapter No. 29 v. Federal Labor Relations
    Authority,
    22 F.3d 1150 (D.C. Cir. 1994) ...........................................................................................37

AT&T Corp. v. FCC,
    86 F.3d 242 (D.C. Cir. 1996) ...............................................................................................3

Biloxi Reg'l Med. Ctr. v. Bowen,
    835 F.2d 345 (D.C. Cir. 1987) ..............................................................................................3

Burlington Truck Lines, Inc. v. United States,
    371 U.S. 156 (1962) ...............................................................................................................3

Chestnut Hill Hosp. v. Thompson,
    No. 04-1128, 2006 WL 2380660 (D.D.C. Aug. 15, 2006) ...................................................35

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984) ................................................................................................................2

Christensen v. Harris County,
    529 U.S. 576 (2000) ................................................................................................................2

County of Los Angeles v. Shalala,
    192 F.3d 1005 (D.C. Cir. 1999) ...........................................................................................37

*General Electric Co. v. U.S. EPA,
    53 F.3d 1324 (D.C. Cir. 1995) ................................................................................... 3, 27-28

GranCare, Inc. v. Shalala,
    93 F. Supp. 2d 24 (D.D.C. 2000) .........................................................................................27

Greyhound Corp. v. ICC,
    551 F.2d 414 (D.C. Cir. 1977) ..........................................................................................3, 24

In re Medicare Reimbursement Litigation (Baystate Health System v. Thompson),
    309 F. Supp. 2d 89 (D.D.C. 2004), aff'd, 414 F.3d 7 (D.C. Cir. 2005), cert. denied,
    547 U.S. 1054 (2006) ..............................................................................................................6

*Denotes authorities principally relied upon.

# TABLE OF AUTHORITIES (CONT.)

McHenry v. Bond,
   668 F.2d 1185 (11th Cir. 1982) ...............................................................3

Memorial, Inc. v. Harris,
   655 F.2d 905 (9th Cir. 1980) ..................................................................3

Mercy Catholic Med. Ctr. v. Thompson,
   380 F.3d 142 (3rd Cir. 2004) .................................................................39

Monmouth Med. Ctr. v. Thompson,
   257 F.3d 807 (D.C. Cir. 2001) ...............................................................23

Motion Picture Ass'n of Am., Inc. v. FCC,
   309 F.3d 796 (D.C. Cir. 2002) ...............................................................37

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
   463 U.S. 29 (1983) ...................................................................................3

Paralyzed Veterans of Am. v. D.C. Arena L.P.,
   117 F.3d 579 (D.C. Cir. 1997) ...............................................................23

Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.,
   332 F.3d 654 (D.C. Cir. 2003) .................................................................2

Riverside Methodist Hosp. v. Thompson,
   No. C2-02-94, 2003 WL 22658129 (S.D. Ohio July 31, 2003)..................7

Satellite Broadcasting Co., Inc. v. FCC,
   824 F.2d 1 (D.C. Cir. 1987) ...................................................................29

Sierra Club v. EPA,
   719 F.2d 436 (D.C. Cir. 1983) ...............................................................38

*Thomas Jefferson Univ. v. Shalala,
   512 U.S. 504 (1994).....................................................................2, 22, 39

Transactive Corp. v. United States,
   91 F.3d 232 (D.C. Cir. 1996).........................................................3, 24, 31

Trinity Broad. of Florida, Inc. v. FCC,
   211 F.3d 618 (D.C. Cir. 2000) ..........................................................3, 27

United States v. Larionoff,
   431 U.S. 864 (1977)..................................................................................2

*Denotes authorities principally relied upon.

# TABLE OF AUTHORITIES (CONT.)

United States v. Mead Corp.,
    533 U.S. 218 (2001) ......................................................................................2

WLOS TV, Inc. v. FCC,
    932 F.2d 993 (D.C. Cir. 1991) ...............................................................3, 24

**STATUTES**

5 U.S.C. § 553(b) ........................................................................................23

5 U.S.C. § 706 .........................................................................................2, 19

42 U.S.C. § 1395d(a)(1) ...............................................................................4

42 U.S.C. § 1395f(b) .....................................................................................7

42 U.S.C. § 1395hh(b) ................................................................................23

42 U.S.C. § 1395k(a)(1)-(2) .........................................................................4

42 U.S.C. § 1395mm(a)(1) ...........................................................................5

42 U.S.C. § 1395mm(a)(3) ...........................................................................5

42 U.S.C. § 1395oo(a) ..................................................................................6

42 U.S.C. § 1395oo(f) ...............................................................................2, 6

42 U.S.C. § 1395oo(f)(1) ..............................................................................6

42 U.S.C. § 1395oo(h) .............................................................................6, 17

42 U.S.C. § 1395w-21(a)(1) ....................................................................4-5, 8

42 U.S.C. § 1395w-21(i)(1) ......................................................................5, 7

42 U.S.C. § 1395w-23(a)(3)(B) ..............................................................11, 28

42 U.S.C. § 1395w-23(c)(3)(B)-(C) ............................................................9

42 U.S.C. § 1395ww(a)(4) ............................................................................8

42 U.S.C. § 1395ww(d) .................................................................................7

42 U.S.C. § 1395ww(d)(5) ............................................................................7

42 U.S.C. § 1395ww(d)(5)(B) .......................................................................7

*Denotes authorities principally relied upon.

## <u>TABLE OF AUTHORITIES (CONT.)</u>

*42 U.S.C. § 1395ww(d)(5)(B)(iv)................................................................... Passim

*42 U.S.C. § 1395ww(d)(11).................................................................... 8-9, 11, 21

42 U.S.C. § 1395ww(d)(11)(A)-(B) ..................................................... 21-22

42 U.S.C. § 1395ww(d)(11)(B) ...........................................................................9

42 U.S.C. § 1395ww(d)(11)(C) ...........................................................................9

42 U.S.C. § 1395ww(h) ........................................................................................8

*42 U.S.C. § 1395ww(h)(3)(D)(i) .................................................... Passim

42 U.S.C. §1395ww(h)(3)(D)(ii) ......................................................................9

42 U.S.C. § 1395ww(h)(4)..................................................................................35

42 U.S.C. § 1395ww(h)(4)(A) ..........................................................................36

*42 U.S.C. § 1395ww(h)(4)(E).................................................... Passim

42 U.S.C. § 1395x(s)(1)-(2) ................................................................................4

44 U.S.C. § 3501(1) .............................................................................................25

44 U.S.C. § 3502(14) ..........................................................................................25

*44 U.S.C. § 3512 ..........................................................................................24, 27

Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001 ...................................11, 22

Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4622 ...............................8

Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4624 ...............................8

Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, § 9202 ...........35

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 § 101(a)(1) ................................................................................4

Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9314(a)...............................36

*Denotes authorities principally relied upon.

# TABLE OF AUTHORITIES (CONT.)

**REGULATIONS**

5 C.F.R. § 1320.3(b)(1)..............................................................................................25

5 C.F.R. § 1320.3(c)..................................................................................................25

5 C.F.R. § 1320.3(c)(1)..............................................................................................25

5 C.F.R. § 1320.5(d)(1)..............................................................................................26

5 C.F.R. § 1320.6......................................................................................................27

5 C.F.R. § 1320.6(c)..................................................................................................25

42 C.F.R. § 405.1803..................................................................................................6

42 C.F.R. § 405.1835..................................................................................................6

42 C.F.R. § 405.1875..................................................................................................6

42 C.F.R. § 405.1877(a)..............................................................................................6

42 C.F.R. § 405.1877(f)..............................................................................................6

42 C.F.R. § 412.1(a)...................................................................................................7

42 C.F.R. § 412.1(a)(1)...............................................................................................8

42 C.F.R. § 412.2(f)...................................................................................................7

42 C.F.R. § 412.105 (2002) .........................................................................................7

42 C.F.R. § 412.105(a)(1) (2002) ..................................................................................9

42 C.F.R. § 412.105(f)(1)(ii)(C) (2002) ...........................................................31, 34, 38

42 C.F.R. § 412.105(g) (2002)...............................................................................9, 40

42 C.F.R. § 413.78(e)(3)(i) (2005) ..........................................................................32, 34

42 C.F.R. § 413.86 (2002) ...........................................................................................8

42 C.F.R. § 413.86(d) (2002).......................................................................................8

42 C.F.R. § 413.86(d)(3) (2002)............................................................................10, 40

42 C.F.R. § 413.86(f)(3)-(4) (2002)......................................................................31, 34, 40

*Denotes authorities principally relied upon.

# TABLE OF AUTHORITIES (CONT.)

42 C.F.R. § 413.86(f)(4)(ii) (2002) ................................................................38

42 C.F.R. § 413.134(a)(3)(ii)(D) ...................................................................40

42 C.F.R. § 417.524 ...........................................................................................5

42 C.F.R. § 417.584 ...........................................................................................5

42 C.F.R. § 422.250 (2002) ...............................................................................5

42 C.F.R. § 422.254(c) (2002) ...........................................................................9

42 C.F.R. § 422.254(e)(2) (2002) ......................................................................9

42 C.F.R. § 422.257 (2002) .............................................................................28

42 C.F.R. § 422.257(a) (2002) ...................................................................13, 16

42 C.F.R. § 422.257(d) (2002) .........................................................................13

42 C.F.R. § 422.257(g)(2) (2002) ....................................................................13

42 C.F.R. § 424.30 ................................................................................... Passim

42 C.F.R. §§ 424.30-.44 .............................................................................. 17-18

42 C.F.R. § 424.44 ............................................................................17, 22, 30

42 C.F.R. § 424.44(a) ........................................................................................30

42 C.F.R. § 489.13(d)(2) ..................................................................................40

54 Fed. Reg. 40286 (Sept. 29, 1989) ..........................................................32, 39

62 Fed. Reg. 45966 (Aug. 29, 1997) ...............................................................12

63 Fed. Reg. 26318 (May 12, 1998) ................................................................12

63 Fed. Reg. 34968 (June 26, 1998) ................................................................13

63 Fed. Reg. 40954 (July 31, 1998) ............................................................ 42-44

64 Fed. Reg. 41490 (July 30, 1999) ............................................................ 43-44

65 Fed. Reg. 40170 (June 29, 2000) ................................................................13

69 Fed. Reg. 48916 (Aug. 11, 2004) ....................................................32, 34, 41-42

*Denotes authorities principally relied upon.

# TABLE OF AUTHORITIES (CONT.)

**LEGISLATIVE HISTORY**

H.R. Rep. No. 105-217 (1997), reprinted in 1997 U.S.C.C.A.N. 176 ...........................................18

H.R. Rep. No. 99-727 (1986), reprinted in 1986 U.S.C.C.A.N. 3607 .........................................36

S. Rep. No. 96-930 (1980), reprinted in 1980 U.S.C.C.A.N. 6241 ........................................ 25-27

**OTHER AUTHORITIES**

Black's Law Dictionary 74 (8th ed. 2004)....................................................................................40

Barnes Hospital v. Mutual of Omaha, HCFA Adm'r Dec., Medicare & Medicaid Guide
    (CCH) ¶ 42,592 (July 5, 1994) ...............................................................................................41

Saint Anthony's Health Center v. BlueCross BlueShield Ass'n / AdminaStar Federal
    Illinois, CMS Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 81,547 (July 19,
    2006) .................................................................................................................... 6, 22-23

Washington Hosp. Ctr. v. Mutual of Omaha, HCFA Adm'r Dec., Medicare & Medicaid
    Guide (CCH) ¶ 36,850 (Feb. 4, 1988) ....................................................................................41

Program Memorandum (Intermediaries), HCFA Pub. 60-A, Trans. No. A-98-21 (July 1,
    1998), Medicare & Medicaid Guide (CCH) ¶ 150,013 ...........................................................13

Program Memorandum (Intermediaries), HCFA Pub. 60A, Trans. No. A-98-44 (Dec. 1,
    1998), Medicare & Medicaid Guide (CCH) ¶ 150,171 ..................................................... 42-43

Program Memorandum, Trans. No. A-03-007 (Feb 3, 2003), Medicare & Medicaid Guide
    (CCH) ¶ 153,163...................................................................................................................30

*Denotes authorities principally relied upon.

# **INTRODUCTION**

This is an action by a Medicare-participating hospital ("Hospital") for judicial review of the final decision of the Secretary of the Department of Health and Human Services ("Secretary"), the federal agency that administers the Medicare program, regarding direct graduate medical education ("GME") and indirect medical education ("IME") payments due the Hospital for services furnished to Medicare beneficiaries from January 1, 1998 through December 31, 2001.

In particular, the Hospital contests two aspects of the Secretary's disallowance of IME and GME payments. First, the Hospital contests the Secretary's application of a duplicative and unapproved claims filing requirement as the basis for denying all GME and IME payments required by statute for services furnished to Medicare beneficiaries who received benefits through a Medicare risk-sharing plan (referred to in this brief as a "Medicare HMO") under Part C of the Medicare Act. Second, the Hospital challenges the Secretary's denial of all GME and IME payments with respect to medical residents' training in non-hospital settings, such as physicians' offices, based on the Secretary's application of a written agreement requirement to exclude from his payment calculations residents' training time that the statute requires him to include.

For the reasons discussed below, the Hospital requests that the Court set aside the Secretary's final decision on both counts and direct the Secretary to make the GME and IME payments due the Hospital for services furnished to Medicare HMO enrollees and the payments with respect to all residents' training in all non-hospital settings in each of the four fiscal years at issue.

## I.    STANDARD OF REVIEW

Jurisdiction over this action lies under 42 U.S.C. § 1395oo(f), which provides that the case "shall be tried pursuant to the applicable provisions under" the Administrative Procedure Act ("APA"). The applicable provisions of the APA require a reviewing court to set aside the Secretary's decision if it is contrary to the statute, arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706.

In reviewing an agency's interpretation of the statute it administers, the plain language of the statute is controlling. If not contradicted by the plain language of the statute, an agency's interpretation may be entitled to substantial deference if it is promulgated through notice and comment rulemaking. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). Informal agency policy statements, manuals, and enforcement guidelines generally are not entitled to Chevron deference, but are entitled to the respect they deserve solely by reason of their intrinsic "power to persuade." See United States v. Mead Corp., 533 U.S. 218, 228 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); Christensen v. Harris County, 529 U.S. 576, 587 (2000); Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs., 332 F.3d 654, 660 (D.C. Cir. 2003) (concluding that a Medicare manual is not entitled to Chevron deference).

An agency's interpretation of its regulations is afforded deference unless it is inconsistent with the plain meaning of the regulations, other indications of the agency's intent at the time of its adoption, or the manifest intent of Congress. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); United States v. Larionoff, 431 U.S. 864, 872-73 (1977). But, even if an agency's interpretation of a regulation would otherwise be entitled to deference, the agency's interpretation may not be applied to penalize a party that was not given fair notice of agency's

position.  See General Electric Co. v. U.S. EPA, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995); see also Trinity Broad. of Florida, Inc. v. FCC, 211 F.3d 618, 628, 630-31 (D.C. Cir. 2000).

The scope of review under the arbitrary and capricious standard entails a careful, searching inquiry as to whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Further, an agency decision that constitutes an unexplained departure from agency precedent must be overturned as arbitrary and capricious.  Transactive Corp. v. United States, 91 F.3d 232, 237-38 (D.C. Cir. 1996); WLOS TV, Inc. v. FCC, 932 F.2d 993, 996-98 (D.C. Cir. 1991); Greyhound Corp. v. ICC, 551 F.2d 414, 416 (D.C. Cir. 1977).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" taking into account "whatever in the record fairly detracts from its weight."  AT&T Corp. v. FCC, 86 F.3d 242, 247 (D.C. Cir. 1996) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939) and Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).  Thus, the reviewing court must subject the agency's decision to searching, careful, and close judicial scrutiny.  See Biloxi Reg'l Med. Ctr. v. Bowen, 835 F.2d 345, 350-53 (D.C. Cir. 1987); McHenry v. Bond, 668 F.2d 1185, 1190 (11th Cir. 1982); Memorial, Inc. v. Harris, 655 F.2d 905, 912 (9th Cir. 1980).

Finally, a reviewing court may uphold agency action only on the basis articulated by the agency in its decision, not on post-hoc rationalizations offered by the agency or its counsel in litigation.  See, e.g., Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-169 (1962); Biloxi Reg'l Med. Ctr., 835 F.2d at 348 n.12, 351 n.18.

## II.    GENERAL BACKGROUND

### A.    MEDICARE PARTS A THROUGH D

This case concerns Medicare payment to a hospital for services furnished to Medicare beneficiaries beginning more than a decade ago.  During the periods at issue, the Medicare Act was divided into four parts, A through D.  In general, Part A of the Act covers "inpatient hospital services" furnished by participating providers of services, like the Hospital in this case. 42 U.S.C. § 1395d(a)(1).  Part B covers hospital services furnished to outpatients, physicians' services, and other medical and health services.  42 U.S.C. §§ 1395k(a)(1)-(2); 1395x(s)(1)-(2). Medicare pays providers, like the Hospital, on a "fee-for-service" basis, discussed further below, for items and services covered under Medicare Parts A and B.  Part C of the Medicare Act, however, permits a Medicare beneficiary "to elect to receive benefits . . . under this subchapter [i.e., the Medicare Act in Title XVIII of the Social Security Act] -- (A) through the original [M]edicare fee-for-service program under parts A and B of this subchapter, or (B) through enrollment in a Medicare + Choice plan under this part [i.e., Part C of the Medicare Act]." 42 U.S.C. § 1395w-21(a)(1).  Part D of the Act, during the period at issue, contained miscellaneous payment provisions and definitions.[1]

Both of the issues in this case concern the Secretary's implementation of special payment provisions in Part D of the Medicare Act that prescribe GME and IME payments for services furnished to Medicare patients.  The first issue relates to statutory provisions for additional IME and GME payment amounts for services furnished to Medicare beneficiaries who elect to receive benefits through enrollment in a Medicare + Choice plan (i.e., Medicare HMO) under Part C of

---

[1]    This Part of the Act is currently designated as Part E following 2003 amendments that established a Medicare prescription drug program in a new Part D of the Act.  See Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173 § 101(a)(1).

the Medicare Act.  The second issue concerns statutory requirements to make IME and GME

payments with respect to all residents' training in patient care settings outside of a hospital.

**B.     BILLING AND PAYMENTS UNDER MEDICARE'S PART A FEE-FOR-SERVICE PROGRAM AND UNDER MEDICARE PART C**

Under the original Medicare fee-for-service program, Medicare payments for services

furnished by hospitals are determined by fiscal intermediaries (usually private insurance

companies) that contract with the Centers for Medicare and Medicaid Services ("CMS"), the

component of the Department of Health and Human Services with responsibility for the day-to-

day operation and administration of the Medicare program.  The fiscal intermediaries make

interim payments to hospitals on an on-going basis upon receipt of patient-specific claims

submitted by hospitals on a CMS-prescribed form, called the "UB-92" form.  Those claims for

payment under the Part A fee-for-service program are required to be filed within the time periods

and subject to the requirements and procedures prescribed in Medicare regulations beginning at

42 C.F.R. § 424.30.

When a Medicare beneficiary enrolls in a Medicare HMO, the Secretary pays the HMO

on a capitation basis (an amount per enrollee) to furnish or arrange for the provision of services

that are covered under Medicare Part A or Part B.  See 42 U.S.C. §§ 1395w-21(a)(1), (i)(1),

1395mm(a)(1), (a)(3); 42 C.F.R. §§ 417.524, 417.584, 422.250 (2002).  Thus, when a hospital

provides services to a Medicare HMO enrollee, the hospital bills and receives payment from the

*HMO* rather than the fiscal intermediary.  Amended Complaint For Sums Due and For

Declaratory and Injunctive Relief Under the Medicare Act ("Complaint") and Answer to

Plaintiff's Amended Complaint ("Answer") ¶ 20.  And, therefore, the procedures, requirements,

and time periods for submission of Medicare Part A claims to the *fiscal intermediaries* expressly

do not apply "when services are furnished on a prepaid capitation basis by [Medicare HMOs]." 42 C.F.R. § 424.30.[2]

After the close of each fiscal year, a hospital is required to file a cost report with the fiscal intermediary. The Medicare fiscal intermediary analyzes the cost report and issues a determination, called a Notice of Program Reimbursement or "NPR," that informs the hospital of the intermediary's final determination as to the amount of program reimbursement due the hospital from the fiscal intermediary for the period. See 42 C.F.R. § 405.1803. See also In re Medicare Reimbursement Litigation (Baystate Health System v. Thompson), 309 F. Supp. 2d 89, 92 (D.D.C. 2004), aff'd, 414 F.3d 7 (D.C. Cir. 2005), cert. denied, 547 U.S. 1054 (2006). That final year-end determination is then reconciled with the aggregate amount of interim payments made to the hospital by the intermediary for services furnished in that fiscal year. Complaint & Answer ¶ 22.

A hospital is entitled to appeal to the Provider Reimbursement Review Board ("PRRB" or "Board"), an administrative tribunal appointed by the Secretary, if it is dissatisfied with an intermediary's determination as to the amount of Medicare payment due the provider for a cost reporting period. 42 U.S.C. § 1395oo(a), (h); 42 C.F.R. § 405.1835. The final decision of the PRRB is subject to review by the Administrator of CMS pursuant to delegation of authority by the Secretary. See 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875. A hospital that is dissatisfied with the Secretary's final decision, as set forth either in a final decision of the Board or of the Administrator of CMS, may appeal to this Court within 60 days of its receipt of notice of the decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(a), (f).

---

[2] See also Saint Anthony's Health Center v. BlueCross BlueShield Ass'n / AdminaStar Federal Illinois, CMS Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 81,547 (July 19, 2006) (construing section 424.30 of title 42 to mean "if an HMO company is responsible for paying the claim, hospitals do not have to submit a claim to the Fiscal Intermediary for payment").

C.      **TWO PAYMENTS UNDER PARTS A AND C FOR BOTH IME AND GME**

   1.      **The IME Payment Under the Part A Fee-For-Service Program**

Under the traditional Medicare fee-for-service program, Medicare pays most hospitals, including the plaintiff Hospital, under a prospective payment system ("PPS") for the operating costs of inpatient hospital services furnished to beneficiaries (who are not enrolled in a Medicare HMO). 42 U.S.C. §§ 1395f(b), 1395ww(d); 42 C.F.R. § 412.1(a). Under the PPS for operating costs, Medicare pays predetermined, standardized amounts for each discharge of a Medicare patient who is entitled to benefits under Part A of the Medicare Act (and who is not enrolled in a Medicare HMO). See 42 U.S.C. §§ 1395ww(d), 1395w-21(i)(1).

The standard per-discharge payment rates under the PPS are subject to certain hospital-specific payment adjustments, which apply to the payment for each discharge of a patient who is entitled to benefits under Part A of the Medicare Act and is not enrolled in a Medicare HMO. See 42 U.S.C. § 1395ww(d)(5); 42 C.F.R. § 412.2(f). One of the hospital-specific adjustments under the original Medicare fee-for-service program is a percentage add-on to the standard per discharge rate for IME. See 42 U.S.C. § 1395ww(d)(5)(B); 42 C.F.R. § 412.105 (2002). This payment adjustment is intended to compensate teaching hospitals for higher-than-average operating costs per discharge that are statistically correlated with the intensity of resident teaching performed by a hospital. See Riverside Methodist Hosp. v. Thompson, No. C2-02-94, 2003 WL 22658129 (S.D. Ohio July 31, 2003). The percentage add-on to the standard payment rate per discharge is determined by the hospital's ratio of residents to beds and is applied to the standard payment for each discharge of a Medicare beneficiary who is entitled to benefits under Medicare Part A. See 42 U.S.C. § 1395ww(d)(5)(B); 42 C.F.R. § 412.105 (2002). Prior to the 1997 legislation discussed below, no payment was made directly to a hospital by the Secretary when the hospital provided services to a Medicare beneficiary enrolled in a Medicare HMO.

     **2.**     **The GME Payment Under the Part A Fee-For-Service Program**

As mentioned above, the PPS applies only to the <u>operating</u> costs of inpatient hospital services furnished to patients entitled to benefits under Medicare Part A.  It does not apply to the other costs of such services, such as capital-related costs and direct costs of approved graduate medical education programs, which are referred to as "GME" costs.  <u>See</u> 42 U.S.C. § 1395ww(a)(4); 42 C.F.R. § 412.1(a)(1).

During the periods at issue here, Medicare made a separate payment under the Part A fee-for-service program for GME.  <u>See</u> 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86 (2002).  The GME payment under the fee-for-service program is based in part on a hospital's number of full-time equivalent residents and in part on the hospital's percentage of total patient days attributable to individuals who were entitled to have payment made on their behalf under the Medicare Part A fee-for-service program.  <u>See</u> 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86(d) (2002).  Prior to the 1997 legislation discussed below, no payment was made directly by the Secretary to a hospital for services furnished to a Medicare beneficiary enrolled in a Medicare HMO.

     **3.**     **1997 Legislation Requiring IME and GME Payments for Services Furnished to Medicare HMO Enrollees Under Part C**

In 1997, Congress amended the Medicare Act to require the Secretary to make IME and GME payments directly to hospitals for services furnished to patients who have elected, pursuant to 42 U.S.C. § 1395w-21(a)(1), to receive Medicare benefits through enrollment in a Medicare HMO under Part C of the Medicare Act.  Balanced Budget Act of 1997 ("BBA"), Pub. L. No. 105-33, §§ 4622, 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11), 1395ww(h)(3)(D)(i)).

With respect to the new IME payment, Congress added a new provision (in Part D of the Act) requiring the Secretary to make "an additional payment" for each discharge of a Medicare

HMO enrollee by a hospital that has an approved residency training program.[3] 42 U.S.C. § 1395ww(d)(11). The additional payment for IME was phased in over a five-year transition period in which like amounts were to be removed from the capitation rates paid to the HMOs. 42 U.S.C. §§ 1395ww(d)(11)(C), 1395w-23(c)(3)(B)-(C); see also 42 C.F.R. § 422.254(c), (e)(2) (2002). Like the IME payment made under the original fee-for-service program, the additional IME payment for services furnished to Medicare HMO enrollees is based in part on a hospital's ratio of residents to beds. 42 C.F.R. § 412.105(a)(1), (g) (2002). The additional payments for IME are supposed to equal "the estimated average per discharge amount" that would have been paid as an IME add-on under the traditional fee-for-service program if Medicare HMO enrollees were entitled to receive benefits under Part A. 42 U.S.C. § 1395ww(d)(11)(C).

With respect to the GME payment, Congress added another provision (again in Part D of the Act) requiring the Secretary to "provide for an additional payment amount" for GME costs of services furnished to a Medicare HMO enrollee. 42 U.S.C. § 1395ww(h)(3)(D)(i). Like the additional IME payment, the new GME payment was also phased in over five years and like amounts were also to be removed from the capitation rates paid to the Medicare HMOs. See 42 U.S.C. §§1395ww(h)(3)(D)(ii), 1395w-23(c)(3)(B)-(C); see also 42 C.F.R. § 422.254(c), (e)(2) (2002). Like the original fee-for-service payment for GME, the "additional payment" for GME costs of services furnished to Medicare HMO enrollees is based in part on a hospital's number of full-time equivalent residents and in part on its percentage of total inpatient bed-days

---

[3]       The relevant provisions of the statute refer to patients who are enrolled in a health maintenance organization ("HMO"), a competitive medical plan with a Medicare risk sharing contract or a Medicare + Choice plan under Part C of the Act. See 42 U.S.C. §§ 1395ww(d)(11)(B), 1395ww(h)(3)(D)(i). For ease of reference, all of these types of entities are referred to collectively in this brief as "Medicare HMOs."

attributable to patients enrolled in a Medicare HMO. 42 U.S.C. § 1395ww(h)(3)(D)(i); 42 C.F.R. § 413.86(d)(3) (2002).

As mentioned above, the 1997 legislation required the Secretary to make the additional IME and GME payments directly to hospitals for services furnished to Medicare HMO enrollees. These additional payments, therefore, are determined and paid to a hospital by the Medicare fiscal intermediary through the year-end cost report process. See Complaint & Answer ¶¶ 46, 54.

> **4.      Relevance of Resident Counts and Medicare HMO Patient Utilization Statistics in the GME and IME Payment Calculations At Issue**

As discussed above, additional IME and GME amounts paid for services furnished to Medicare HMO enrollees under Part C are based in part on the hospital's utilization by Medicare HMO enrollees. The additional payment for IME depends in part on the amount that would have been paid under the Part A fee-for-service program for each discharge of a Medicare beneficiary enrolled in a Medicare HMO, while the additional payment for GME depends in part on the hospital's percentage of total patient days attributable to Medicare HMO enrollees. Thus, the greater the number of HMO patients that are included in these calculations, the greater the additional IME and GME amounts that will be paid by the Secretary to the hospital for services furnished to Medicare patients enrolled in a Medicare HMO. See Complaint & Answer ¶ 57. Conversely, if no Medicare HMO patients are included in these calculations, as in this case, then no additional payment will be provided by the Secretary to the hospital for services furnished to Medicare HMO enrollees. See id.

As discussed above, all of the IME and GME payments - both the original payments made under the Part A fee-for-service program and the new payments made for services furnished to Medicare HMO enrollees under Part C - are determined in part based on a hospital's

number of residents in approved programs.  Thus, the greater a hospital's full-time equivalent number of residents, the greater the original IME and GME payments under the Part A fee-for-service program and the greater the additional payments for services furnished to HMO enrollees under Part C.  See Complaint & Answer ¶¶ 49, 56.  Conversely, when a hospital's resident count is reduced, as in this case, by excluding residents' training in a  non-hospital setting, the IME and GME payments made under Part A and the additional payments made for services furnished to Medicare HMO enrollees under Part C will be improperly understated.  See  id.

### III.    FIRST ISSUE

#### DENIAL OF ALL  IME AND GME PAYMENTS UNDER PART C FOR SERVICES FURNISHED TO MEDICARE HMO ENROLLEES

**A.    FACTS SPECIFIC TO THIS ISSUE**

**1.    Legal Authorities and Agency Guidance Regarding Submission of Patient Encounter Data for Hospital Services Furnished to Medicare HMO Enrollees**

As discussed above, Congress amended the Medicare Act in 1997 to require the Secretary to make additional IME and GME payments to teaching hospitals for Medicare HMO enrollees. 42 U.S.C.  §§ 1395ww(d)(11),  1395ww(h)(3)(D)(i).   In that same 1997 legislation, Congress required the Secretary to collect Medicare HMO patient data from the Medicare HMOs, together with any other information the Secretary deemed necessary, regarding inpatient hospital services furnished to Medicare HMO enrollees.[4]  Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)).

As discussed further below, the implementing regulations required the Medicare HMOs to  furnish  inpatient  hospital  encounter  data  for  their  enrollees  to  the  Medicare  fiscal

---

[4]      Congress required the Secretary to obtain this data from the HMOs in order to carry out his statutory obligation to develop a risk adjustment to the capitation rates paid to the HMOs. 42 U.S.C. § 1395w-23(a)(3)(B).  The data submitted by the HMOs is precisely the same data that a hospital would include on claims for payment under the Part A fee-for-service program.

intermediaries on the same form and in the same format as when a hospital submits a Part A claim for payment under the traditional fee-for-service program.    No regulation requires a hospital to also submit this information again to the intermediary in order to receive the additional IME and GME payments required by the 1997 amendments to the Medicare Act.    This alleged requirement, which was applied to deny all IME and GME payments to the Hospital for services furnished to Medicare HMO patients, is said to arise only under Medicare program guidance.

a.    Implementing Regulations

The Secretary adopted a final rule implementing the 1997 legislation in August 1997. 62 Fed. Reg. 45966 (Aug. 29, 1997).    In the preamble to that rule, the Secretary acknowledged that Congress required him to provide additional IME and GME payments to hospitals with respect to Medicare HMO enrollees, that Congress required him to collect the necessary data *from the Medicare HMOs* to implement adjustments to the capitation rates paid to the HMOs, and that his agency was "considering the data requirements necessary to implement both the direct and indirect medical education [i.e., GME and IME] and [Medicare HMO] risk adjustment provisions."    Id. at 46007.    Nothing in that rule, however, required hospitals to submit a claim directly to the Medicare fiscal intermediary in order to receive the additional IME or GME payment under Part C for services furnished to Medicare HMO enrollees.

About nine months later, in the preamble to a final rule published on May 12, 1998, the Secretary stated:    "We anticipate *teaching hospitals* will need to submit claims associated with [Medicare HMO] discharges to the fiscal intermediaries for purposes of receiving indirect and direct medical education payments."    63 Fed. Reg. 26318, 26342 (emphasis added).    The Secretary, however, did not adopt that requirement in the final rule.

On the contrary, about one month later, in June 1998, the Secretary adopted a regulation requiring *Medicare HMOs* to submit hospital encounter data to the fiscal intermediaries for each HMO's own enrollees. 63 Fed. Reg. 34968, 35092 (June 26, 1998). That regulation, which was codified at 42 C.F.R. § 422.257(a), states:

> Each M+C organization must submit to [CMS] (in accordance with [CMS] instructions) all data necessary to characterize the context and purposes of each encounter between a Medicare enrollee and a provider, supplier, physician, or other practitioner.

In the preamble to that rule, the Secretary further explained:

> *[W]e will hold the M+C organization responsible for transmission of the data*. If the M+C organization is held responsible, it follows that they should transmit the data directly, rather than monitoring the transmission by their providers.

63 Fed. Reg. at 35006 (emphasis added).[5] The Medicare HMOs were required to submit that data to the Medicare fiscal intermediaries on a form and in a format "identical" to the form and format of hospital claims for payment to the intermediaries under the Medicare Part A fee-for-service program. See id.; see also 65 Fed. Reg. 40170, 40249 (June 29, 2000); 42 C.F.R. § 422.257(d) (2002) (stating that the Medicare HMOs' submission of data to the fiscal intermediaries must "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate").

        b.    <u>Program Instructions to Intermediaries</u>

In July 1998, CMS issued a program memorandum to the Medicare fiscal intermediaries regarding "intermediary and standard system changes needed" to provide the additional IME and GME payments for services furnished to Medicare HMO enrollees. Program Memorandum

---

[5]     In June 2000, the Secretary issued a rule that established a retrospective HMO payment reconciliation process for encounter data that was not timely submitted by the *Medicare HMOs* to the fiscal intermediaries due to several problems in the submission of encounter data. See 65 Fed. Reg. at 40250 (emphasis added); see also 42 C.F.R. § 422.257(g)(2) (2002). The 2000 rule recognized the statutory mandate that it was the HMOs, not hospitals, that were to submit the encounter data to the intermediaries. See 65 Fed. Reg. at 40246.

(Intermediaries), HCFA Pub. 60-A, Trans. No. A-98-21 (July 1, 1998), Medicare & Medicaid Guide (CCH) ¶ 150,013, Administrative Record ("A.R.") at 569. The CMS Administrator principally relied upon this transmittal in his final decision in this case.

The July 1998 program memorandum instructed intermediaries that hospitals "must submit a claim to the hospitals' regular intermediary in UB-92 format [*i.e.*, the standard Medicare billing and claims form]." Id. (emphasis added). But, the program memorandum also stated that "[b]eginning with discharges on or after July 1, 1998, providers may not submit HMO paid claims (no pay bills) to their intermediary." A.R. at 570 (emphasis added). Further, the program memorandum instructed the fiscal intermediaries to notify hospitals only that they "may submit bills for inpatient stays by managed care enrollees for payment of IME." Id. (emphasis added). The program memorandum *did not* instruct the intermediaries to give hospitals notice that they must submit claim forms in order to receive IME payments for services furnished to Medicare HMO enrollees. Nor did it instruct the intermediaries to notify providers that these forms must be submitted directly to the intermediaries within a specific timeframe or in specified manner. Id. In addition, the program memorandum said nothing at all about submitting claim forms with respect to additional GME payments for Medicare HMO enrollees.

Following the issuance of the Secretary's July 1998 program memorandum, the Hospital's fiscal intermediary issued a newsletter, entitled "Medicare Bulletin 416," which addressed, among other things, IME (but not GME) payments with respect to Medicare HMO enrollees. See A.R. at 521. In its totality, the portion of the newsletter addressing "IME Costs" comprised approximately one quarter of one page. A.R. at 521.

The brief portion of the newsletter addressing IME payments opens by stating that "beginning with discharges on or after July 1, 1998, providers may not submit HMO paid claims

14

(no pay bills) to their intermediary." Id. (emphasis added). The second sentence states that "[t]eaching hospitals may submit bills for inpatient stays by managed care enrollees for payment of IME." Id. (emphasis added). The Bulletin did not state to whom the bills (or claim forms) "may" be submitted, however, nor did it address any required time period during which they "may" submit these claims. Id. The Bulletin said nothing at all about additional GME payments for HMO enrollees.

### 2.    Medicare HMO Patient Encounter Data Submitted in this Case

By letter dated July 17, 1998, the Hospital asked its Medicare fiscal intermediary for guidance concerning the implementation of the 1997 legislation providing for additional GME and IME payments with respect to Medicare HMO enrollees. Plaintiff's Statement of Material Facts As to Which There Is No Genuine Issue ("Pl. Stmt.") ¶ 15. The intermediary responded shortly thereafter in a letter stating that "hospitals must submit a claim to the hospital's regular intermediary in UB-92 format." A.R. at 519, see Pl. Stmt. ¶ 16. However, the letter did not specify any required timeframe for submission of these claims and simply referred to the intermediary's Bulletin for "relevant billing changes." A.R. at 519, see also Pl. Stmt. ¶ 16, A.R. at 521. Like the Bulletin and CMS' transmittal, the intermediary's letter to the Hospital did not address GME payments, except to state that the intermediary still needed to make a "system enhancement" in order to implement the provision for those payments. A.R. at 519, see also Pl. Stmt. ¶ 16, A.R. at 521.

The Hospital timely submitted bills to the Medicare HMO plans for services furnished to Medicare HMO enrollees during each of the periods at issue here. A.R. at 38-39, 409. Those bills were submitted to the Medicare HMOs on the same CMS-prescribed claim forms that are used to submit bills to the fiscal intermediaries under the Medicare Part A fee-for-service

15

program.  Id.  And, the HMOs were required by law to furnish that same information, on the same form, to the fiscal intermediaries.  42 C.F.R. § 422.257(a) (2002).

After filing its cost report for 1998, the Hospital notified the fiscal intermediary that its Medicare HMO patient encounter data (on the CMS-prescribed form) would be available for the intermediary's review during its audit of the Hospital's cost report for that period.  Pl. Stmt. ¶ 18.  Upon completion of its audit of the Hospital's cost report for its fiscal year 1998, the intermediary *accepted* the Medicare HMO patient encounter data that the Hospital furnished at audit, and incorporated it in an NPR dated September 28, 2001.  Pl. Stmt. ¶ 19.

In 2003, the intermediary reversed itself.  Pl. Stmt. ¶ 20.  In a revised determination for 1998, dated February 13, 2003, the fiscal intermediary amended the Hospital's previously-settled cost report for 1998 by removing all of the statistics relating to services that the Hospital had furnished to Medicare HMO enrollees in 1998.  Id.  As result of that revised determination for 1998, the intermediary did not make payment of any additional IME and GME amounts for services furnished to Medicare HMO enrollees in the Hospital's 1998 fiscal year.  See id.

In addition, the fiscal intermediary also refused to accept or include the Hospital's Medicare HMO patient encounter data for the services it furnished to Medicare HMO enrollees in its final payment determinations for the Hospital's 1999, 2000 and 2001 fiscal years.  Pl. Stmt. ¶ 25.  The intermediary made these determinations despite the fact that Medicare HMO patient encounter data was furnished to the intermediary on the same Medicare claim form not once, but twice:  first, as statutorily required by the Medicare HMOs and second, by the Hospital in advance of the audit for each fiscal year.  Pl. Stmt. ¶¶ 17-18, 21-24; A.R. at 2154.

### 3.    Decisions Below

The Hospital timely appealed each of the intermediary's final determinations for fiscal years 1998, 1999, 2000 and 2001 to the PRRB.  Pl. Stmt. ¶ 6.  After conducting a hearing and

based on its consideration of all evidence in the record, a majority of the Board, all of whom are appointed by the Secretary,[6] reversed the intermediary's determination. A.R. at 24-41. With respect to the claims filing requirements in 42 C.F.R. §§ 424.30-.44, the Board majority found and concluded:

> [P]rior to BBA '97, in order to receive payment for the services furnished to Medicare beneficiaries, the hospital filed its claim for payment directly with its Medicare intermediary. But if the beneficiary was a member of a risk HMO which had been prepaid by Medicare, the hospital filed its claim for payment for services furnished with the HMO, not the intermediary. The claims in question, for services furnished by and paid for by Medicare + Choice organizations or other Medicare risk plans, are specifically exempt from the requirements, procedures and time limits under this section [referring to 42 C.F.R. § 424.44]. The information that would be needed to process these claims by intermediaries is contingent upon the Medicare HMO plans' payment processing methods which are entirely disparate from the fee-for-service plan.

A.R. at 36. Further, the Board found that the 1997 legislation and implementing regulations "clearly shifted the burden for filing encounter data squarely to the risk HMOs," and there was no change to section 424.30 or any other Medicare regulation that would have given hospitals notice that they would be required to file another, duplicate claim with the Medicare fiscal intermediary in order to receive the additional IME and GME payment amounts for services furnished to Medicare HMO enrollees as mandated by the 1997 amendments to the Medicare Act. Id. at 37.

Thus, the Board concluded, "CMS' effort to impose a contrary claims filing requirement via guidance in an Administrative Bulletin is insufficient to deprive a provider of its statutory right to payment." Id. at 38. In conclusion, the Board ruled that it was an abuse of discretion for the intermediary to refuse to audit the HMO patient data that were indisputably filed timely with the Medicare HMOs and were made available to the intermediary prior the time of its audits. Id. at 38-39, 41.

---

[6]    See 42 U.S.C. § 1395oo(h).

The Administrator of CMS reversed the Board's decision on this issue. A.R. at 1-17. Although the Administrator acknowledged that services furnished to Medicare HMO enrollees are not controlled by the claims filing requirements in 42 C.F.R. § 424.30 et seq., he concluded that a hospital was required "to submit claims in conformity with [those regulations] to be able to include [Medicare HMO] enrollees for the Part A IME and DGME payments from its intermediary." A.R. at 13. The Administrator found that this interpretation of those regulations was "anticipated" (but not adopted) in the preamble to the final rule published on May 12, 1998, and was ultimately articulated in the later program memorandum that was issued to the Medicare fiscal intermediaries in July 1998. Id. at 14. Finally, the Administrator concluded that the regulatory exception to the claims filing requirements for services furnished to HMO enrollees "is not at issue here" because the "claims in the instant case were claims for an established reimbursement methodology for hospitals' costs associated with being a teaching hospital [*sic*] and not for services furnished to a managed care enrollees [*sic*]." Id. at 15-16.

## B.    ARGUMENT

The 1997 amendments to the Medicare Act were intended to remove IME and GME amounts from the capitation rates that were paid by the Secretary to Medicare HMOs and to provide for direct payments of those amounts by the Secretary to the hospitals that treat the Medicare HMO enrollees. Congress' apparent concern was that these payment amounts were not making their way through the HMOs to the treating hospitals. H.R. Rep. No. 105-217, at 659-60 (1997), reprinted in 1997 U.S.C.C.A.N. 176, 280-81.

The intent of the amendments most certainly was not to reduce the Secretary's budget outlays. Yet, that is exactly the result, if not the very purpose, of the Secretary's application of his unnecessary and duplicative claims filing requirement in this case. The Secretary's application of that requirement advances no legitimate policy or program objective. The filings

18

required by the Administrator's decision in this case would have only duplicated the same information that the Hospital submitted to the HMOs and that the HMOs were required to submit to the fiscal intermediaries. Nothing more was needed by the Secretary or his intermediary to determine the additional IME and GME payment amounts due the Hospital for the services it furnished to Medicare HMO patients.

But, even if more were needed, the Hospital presented the same information to the intermediary again at the time of the audit of each year's Medicare cost report. The intermediary's refusal to accept that information, and the Secretary's ultimate denial of the payments at issue, reflects the complete elevation of form over substance with no legitimate purpose. Accordingly, it should be set aside in accordance with the applicable standard of review under the APA, 5 U.S.C. § 706, because his decision is contrary to law, arbitrary and capricious and not based upon substantial evidence in the record.

To begin with, the Administrator's decision in this case conflicts with the plain meaning of the controlling provisions of the Medicare statute governing the additional IME and GME payments for services furnished to Medicare HMO enrollees under Part C of the Medicare Act and the Part A claims filing regulation that the CMS Administrator purports to have relied upon.

Moreover, the Secretary's new claims filing requirement for services furnished to Medicare HMO enrollees was never approved as required by the Paperwork Reduction Act. Accordingly, the public protection provision of that Act precludes the Secretary from depriving the Hospital of the benefit of the additional IME and GME payment amounts at issue due to the Hospital's failure to comply with the Secretary's bootleg reporting requirement.

Finally, as evidenced most directly by the fiscal intermediary's initial acceptance in 2001 of the HMO patient data that was made available at the time of the cost report audit for 1998, the

Secretary failed to provide fair notice of the claims filing requirement that he has applied in this case. By the time in 2002 when the Hospital first received clear notice of this requirement -- when the intermediary issued its final determination for the Hospital's 1999 fiscal year -- it was too late for the Hospital to submit claims within the time periods imposed under the Secretary's claims filing requirements for services paid under Medicare Part A.

### 1.    The Administrator's Decision is Inconsistent with the Plain Language of the Controlling Statutes and Regulations.

The CMS Administrator's decision upholding the denial of the additional IME and GME payments for services furnished to Medicare HMO enrollees is contrary to law in several respects. In brief, the Administrator's denial of these additional payment amounts stands on his conclusion that the Hospital did not submit Medicare Part A claims to the Medicare intermediary within a time period established under regulations beginning at 42 C.F.R. § 424.30. Those requirements are inapplicable here, however. What is more, the claims that the Administrator contends that the Hospital should have submitted to the intermediary would have duplicated the same information that the Hospital timely submitted (on the same form) to the HMOs, and that the HMOs, in turn, were required to furnish to the intermediary (again on the same form). Thus, the Administrator's decision must be set aside because it conflicts, in at least four respects, with the Medicare Act and the regulations on which the Administrator relied.

First, the Administrator mischaracterized the additional IME and GME payments at issue as Part A payments instead of payments for services furnished to Medicare HMO enrollees under Part C. As noted above, the Administrator concluded that hospitals are required "to submit claims in conformity with [sections 424.30 through 424.44] to be able to include [Medicare HMO] enrollees for the Part A IME and DGME payments from its intermediary." A.R. at 13. But, the additional IME and GME payments at issue are not *Part A* payments as the

Administrator's decision suggests.  The Balanced Budget Act of 1997 amended the Medicare Act by adding two new provisions to the former *Part D* of the Act, requiring the Secretary to provide additional payment amounts for services furnished to Medicare HMO enrollees under *Part C* of the Act.  See 42 U.S.C. §§ 1395ww(d)(11), 1395ww(h)(3)(D)(i).  The Administrator's suggestion that the additional payment amounts at issue are "Part A . . . payments" simply has no basis in any provision found in Part A of the Medicare Act.

Second, the Administrator's decision is inconsistent with the plain meaning of the governing provisions of the Act as well as the Part A claims regulation he relies upon, because it fails to recognize that the 1997 amendments created two new provisions in Part D of the Act for additional IME and GME payment amounts for services furnished to Medicare HMO enrollees under Part C.  As noted above, the Administrator contends that the Hospital needed to file Part A "claims for an established reimbursement methodology for hospitals' costs associated with being a teaching hospital [*sic*] and not for the services furnished to a managed care enrollees [*sic*]."  A.R. at 16.  But, this conclusion is patently wrong on both counts.

To begin with, the IME and GME payments at issue are not part of the "established reimbursement methodology."  These "additional payment amounts" were provided for in the 1997 amendments to the Act, effective beginning with the 1998 period at issue in this case.  See 42 U.S.C. §§ 1395ww(d)(11)(A)-(B), 1395ww(h)(3)(D)(i).

Moreover, these "additional payment amounts" plainly are not "for hospitals' costs associated with being a teaching hospital."  As the statute makes clear, both of these additional payment amounts are "for" the services furnished to Medicare HMO enrollees.  As discussed above, the 1997 amendments to Part D of the Act provide that "the Secretary *shall provide* for an additional [IME] payment amount *for each applicable discharge . . . of any individual who is*

*enrolled*" in a Medicare HMO.   42 U.S.C. § 1395ww(d)(11)(A)-(B) (emphasis added). Similarly, the 1997 amendments provide that "the Secretary *shall provide* for an additional [GME] payment amount under this subsection *for services furnished to individuals who are enrolled*" in a Medicare HMO. 42 U.S.C. § 1395ww(h)(3)(D)(i) (emphasis added).   Thus, the plain language of the statute squarely conflicts with the Administrator's assertion that the long-established exception to the Part A claims filing requirements for services furnished to Medicare HMO enrollees "is not at issue here."  A.R. at 15.

As the Secretary's Board found, "[t]he claims in question, for services furnished by and paid for by [Medicare HMOs], are specifically exempt from the requirements, procedures and time limits under [42 C.F.R. § 424.44]."  A.R. at 36.  Indeed, in at least one other case, the Administrator of CMS clearly affirmed that "if an HMO company is responsible for paying the claim, hospitals do not have to submit a claim to the Fiscal Intermediary for payment."  Saint Anthony's Health Center v. BlueCross BlueShield Ass'n / AdminaStar Federal Illinois, CMS Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 81,547 (July 19, 2006).  The Administrator's contrary decision in this case is inconsistent with the plain meaning of the regulations establishing the Part A claims filing requirements he relied upon and, therefore, the Administrator's decision must be reversed.  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (a reviewing court must set aside an agency's interpretation of its regulations when "an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation'") (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1998)).

Third, as discussed above, the 1997 amendments to the Medicare Act required the Secretary to collect Medicare HMO patient data from the HMOs, not the hospitals.  BBA, Pub.

L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)).  As the Secretary's Board

found (A.R. at 37), CMS' decision to shift the burden to the hospitals of furnishing this

information (in duplicate) directly to the fiscal intermediaries as well as to the HMOs is

inconsistent with the statutory provisions requiring the Secretary to collect this information

directly from the Medicare HMOs.

      Fourth, and finally, having previously interpreted the regulation the Administrator relied

upon in this case as not applying to services for which "an HMO company is responsible for

paying the claim," see Saint Anthony's Health Center v. BlueCross BlueShield Ass'n /

AdminaStar Federal Illinois, CMS Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 81,547

(July 19, 2006), the Secretary must invoke the notice-and-comment rulemaking procedures

mandated by the APA and the Medicare Act if he wishes to apply the claims filing requirements

established under that rule to all or some portion of the services furnished to Medicare HMO

enrollees.[7]  See, e.g., Monmouth Med. Ctr. v. Thompson, 257 F.3d 807, 813-14 (D.C. Cir. 2001);

Alaska Prof'l Hunters Ass'n, Inc. v. FAA, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999); Paralyzed

Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 586 (D.C. Cir. 1997).  The Secretary,

however, did not invoke the APA's notice and comment rulemaking procedure to amend the pre-

existing regulations beginning at section 424.30.  See A.R. at 38.  Accordingly, insofar as the

Secretary's decision in this case relies upon the 1998 program memorandum and other agency

guidance so as to impose a new requirement to submit Part A claims directly to the Medicare

fiscal intermediaries for services furnished to Medicare HMO enrollees, the decision must be

---

[7]     The Medicare Act, 42 U.S.C. § 1395hh(b), imposes a notice-and-comment rulemaking
requirement similar to the requirement established in the APA, 5 U.S.C. § 553(b).  See
Monmouth Med. Ctr. v. Thompson, 257 F.3d 807, 814 (D.C. Cir. 2001).

reversed because as applied here, those instructions are procedurally invalid amendments to the regulations beginning in section 424.30.[8]

> **2.    The Secretary's Duplicate Billing Requirement for Services Furnished to Medicare HMO Patients Is Unenforceable Under the Paperwork Reduction Act Because It is an Unapproved and Invalid Reporting Requirement**

Even if the Secretary's policy requiring hospitals to submit unnecessarily duplicative claim forms both to Medicare HMOs and to their fiscal intermediaries did not conflict with the statute and the Secretary's own regulations (which it does), the Administrator's decision in this case is still invalid and unenforceable under the public protection provision of the Paperwork Reduction Act. See 44 U.S.C. § 3512. The Paperwork Reduction Act is intended to eliminate unnecessary and duplicative government paperwork requirements. Its public protection provision precludes the Secretary from denying the Hospital the benefit of the additional IME and GME payments at issue due to its alleged failure to comply with the Secretary's unapproved requirement that hospitals must submit duplicate claims to the Medicare intermediaries in order to receive those payments.

The public protection provision of the Paperwork Reduction Act provides that "[n]otwithstanding any other provision of law," a party like the Hospital may not be "subject to any penalty for failing to comply with a collection of information" imposed by a federal agency that fails to obtain the required approval from the Office of Management and Budget ("OMB"). Id. The legislative history of the statute puts it more bluntly, stating that any "[i]nformation collection requests" that fail to obtain the required approval "are to be considered 'bootleg'

---

[8]    By the same token, the Administrator's decision in this case is also arbitrary and capricious, and must be reversed, because it constitutes an unexplained departure from agency precedent interpreting the claims filing requirements under section 424.30 as not applying to services furnished on a prepaid capitation basis by a Medicare HMO. See, e.g., Transactive Corp., 91 F.3d at 237-38; WLOS TV, Inc., 932 F.2d at 996-98; Greyhound Corp., 551 F.2d at 416.

requests and may be ignored by the public." S. Rep. No. 96-930, at 52 (1980), <u>reprinted in</u> 1980 U.S.C.C.A.N. 6241, 6292. Consistent with the statute, OMB's implementing regulations extend the requirement to requests for information in "<u>any</u> form or format," which would include the submission of UB-92 claim forms to the Medicare fiscal intermediaries for services furnished to Medicare HMO enrollees. <u>See</u> 5 C.F.R. § 1320.3(c)(1) (emphasis added).

The statute includes in the definition of "penalty" the "denial of a…benefit," like the Secretary's denial of Medicare reimbursement for IME and GME costs in this case. 44 U.S.C. § 3502(14). Thus, when a party fails to comply with an unapproved information reporting requirement that is a condition to receipt of a benefit, the agency may not treat the failure to comply with that requirement as a ground for denial of the benefit and must allow the party to satisfy the legal conditions for receipt of the benefit through other reasonable means. 5 C.F.R. § 1320.6(c).

Among the primary purposes of the Paperwork Reduction Act are to "minimize the paperwork burden," 44 U.S.C. § 3501(1), and to "[e]nsure[] that paperwork required from the public is first checked to see whether the information requested is: (1) Needed; (2) Not duplicative; and (3) Collected efficiently." S. Rep. No. 96-930, at 2 (1980), <u>reprinted in</u> 1980 U.S.C.C.A.N. 6241, 6242. OMB regulations define the term "burden" to include the time and expense of "provid[ing] information to or for a Federal agency," which, apropos here, specifically includes "identical reporting" of information. 5 C.F.R. § 1320.3(b)(1), (c).

The Secretary's requirement that hospitals submit a duplicate UB-92 claim form to their intermediaries in addition to the UB-92 claim forms that the hospitals were already required to submit to the Medicare HMOs (and which the Medicare HMOs were required by law to furnish to the intermediaries), is just the type of burdensome, unnecessary, duplicative and inefficient

25

paperwork requirement that the Paperwork Reduction Act was enacted to prevent. Indeed, the legislative history to the Paperwork Reduction Act specifically referenced the "explosion in paperwork" that hospitals have experienced since the advent of Medicare as a prime example of the need for the legislation. S. Rep. No. 96-930, at 3 (1980), reprinted in 1980 U.S.C.C.A.N. 6241, 6243.

To the extent that CMS' transmittals could otherwise permissibly be read to require the Hospital to file duplicate claim forms both with the Medicare HMOs (who were required by law to furnish the same claim forms to the intermediaries) *and* directly with their fiscal intermediaries, as the Administrator's decision says they were, that latter "collection of information" was never approved by the OMB. And, even if the Secretary had ever sought approval of such a requirement, it is virtually certain that he could not have obtained such approval, consistent with the plain language and intent of the Paperwork Reduction Act. The Secretary could not meet his burden to demonstrate that this additional reporting requirement is "the least burdensome [action] necessary for the proper performance of the agency's functions to comply with legal requirements and achieve program objectives" and that it is "not duplicative of information otherwise accessible to the agency." 5 C.F.R. § 1320.5(d)(1). Tellingly, the Administrator in his decision in this case did not even acknowledge his failure to obtain OMB approval, even though the Hospital raised this argument below. A.R. at 104-06.

In light of the Secretary's failure to go through the OMB approval process for this overly burdensome and unnecessary information collection, the Secretary's denial of IME and GME payments cannot be sustained. The Secretary cannot deprive the Hospital of the benefit of additional payment amounts that the Secretary was required by law to pay merely because the Hospital failed to comply with the Secretary's unapproved, "bootleg" request for submission of

duplicative and unnecessary claim forms.  See 44 U.S.C. § 3512; 5 C.F.R. § 1320.6; see also S. Rep. No. 96-930, at 52 (1980), reprinted in 1980 U.S.C.C.A.N. 6241, 6292.  Instead, the Secretary must allow the Hospital to show that it meets the legal conditions to receipt of these additional payment amounts by other reasonable means.  In this case, the Hospital satisfied the applicable legal conditions by submitting the HMO patient encounter data first to the HMOs and again to the intermediary in connection with its audits of the Hospital's cost reports.

> ### 3.     As the Secretary's Board Found, the Hospital Was Not Afforded Fair Notice of Any Requirement to Submit Encounter Data or Claims Directly to the Medicare Intermediary for Services Furnished to Medicare HMO Enrollees

The Administrator's denial of additional payment amounts at issue for services furnished to Medicare HMO patients is also invalid, and must reversed, because the undisputed record evidence shows that the Hospital was not given fair notice of any requirement to submit duplicate claim forms to both the Medicare fiscal intermediary and the Medicare HMOs, and the Hospital was never given any notice at all that it needed to do so within a specific timeframe. Moreover, the Secretary has provided no rational explanation for his dissimilar treatment of the Hospital in this case and of other hospitals and Medicare HMOs that received retrospective payment adjustments to take into account Medicare HMO patient encounter data that was not timely submitted to the Medicare intermediaries.

It is well established that even if an agency's interpretation of its regulation would otherwise be entitled to deference, the agency cannot apply its interpretation to penalize a party if the agency's rules did not provide fair notice of what was required or prohibited.  See General Electric Co. v. U.S. EPA, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995); see also Trinity Broad. of Florida, Inc. v. FCC, 211 F.3d 618, 628, 630-31 (D.C. Cir. 2000) (applying the notice requirement to the FCC's denial of a broadcasting license); GranCare, Inc. v. Shalala, 93 F. Supp. 2d 24, 31-33 (D.D.C. 2000) (reversing the Secretary's disallowance of Medicare

reimbursements because the agency's program manual did not provide fair notice of the standard applied to disallow those reimbursements). The Court of Appeals has established the following standard for determining whether a party received fair notice:

> [W]e must ask whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations. If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation.

General Electric Co., 53 F.3d at 1329.

As discussed above, Secretary's regulations governing the submission of Part A claims to the fiscal intermediary are expressly inapplicable when services are furnished to Medicare HMO enrollees. 42 C.F.R. § 424.30. That, combined with the Medicare statute and regulation providing for the required submission of encounter data for these services by the Medicare HMOs,[9] would reasonably be understood to mean that hospitals are not required also to submit claim forms to their intermediaries for services provided to Medicare HMO enrollees.

Indeed, even if the Secretary's regulations were read in conjunction with the agency's later program memoranda and other guidance, only one thing is clear: the Hospital could not have ascertained with certainty that it needed to comply with regulations that on their face were expressly inapplicable to claims for services furnished to Medicare HMO enrollees. See supra § III.A.1; see also General Electric Co., 53 F.3d at 1329 (describing the standard for notice as whether a party reading the agency's rules could ascertain with reasonable certainty what the rules require). In fact, when the Hospital affirmatively sought guidance from its Medicare intermediary, Pl. Stmt. ¶¶ 15-16, 21-23, it never received any consistent guidance as to when and

---

[9]    See 42 U.S.C. § 1395w-23(a)(3)(B); 42 C.F.R. § 422.257 (2002).

how it was supposed to submit encounter data or any required time period for doing so until it was too late for the Hospital to comply with the Secretary's requirement.  See supra § III.A.1-2. At best, CMS' guidance was promulgated "in a baffling and inconsistent fashion."  See Satellite Broadcasting Co., Inc. v. FCC, 824 F.2d 1 (D.C. Cir. 1987) (finding that because agency's rules addressed filing of application "in a baffling and inconsistent fashion," agency could not "use that interpretation to cut off a party's right").

For example, CMS' June 1998 program memorandum instructed the fiscal intermediaries to notify hospitals not that they must, but only that they "may" submit claims for payment of IME.  A.R. at 570.  That memorandum addressed no time required time period for the submission of such claims and did not address GME payments at all.

Apparently, the Secretary's own fiscal intermediary was itself uninformed and confused as to the Secretary's plan at least until 2002.  Tellingly, the intermediary initially *accepted and included the HMO patient encounter data* that the Hospital submitted for 1998, apart from the Part A claims filing process and in connection with the intermediary's audit of the Hospital's cost report for the 1998 fiscal year.  Pl. Stmt. ¶ 19.  Indeed, as late as March 2002, the Hospital still had not received clear guidance from the fiscal intermediary regarding whether duplicate claims needed to be filed and if so, when or how.  Pl. Stmt. ¶¶ 21-23.  By the time the intermediary finally did give the Hospital notice that the claims submission regulations would be applied--when it issued a final determination for the Hospital's fiscal year 1999 in August 2002-- it was too late for the Hospital to meet the Secretary's requirement within the time period

required for filing Part A claims under section 424.44.[10]  Thus, the Hospital was never given notice of the Secretary's interpretation of his regulation at a time when it could have done something to comply with that interpretation, and the Hospital, therefore, should not be penalized for its failure to meet that expectation.

In other similar situations, moreover, the Secretary has recognized the need to make retrospective payment adjustments in order to take into consideration HMO patient encounter data that was not timely submitted to the Medicare intermediaries.  In 2003, for example, CMS issued a program memorandum addressing the payment of additional GME amounts for services furnished to Medicare HMO enrollees in prior years by certain hospitals that are not subject to the prospective payment system (and thus receive no IME payments).  Program Memorandum, Trans. No. A-03-007 (Feb 3, 2003), Medicare & Medicaid Guide (CCH) ¶ 153,163, A.R. at 572-73.  The memorandum confirmed the agency's current view that hospitals are required to submit claims "to their regular intermediary in UB-92 format" in order to obtain these additional GME payments.  Id. at 572.  Nonetheless, the memorandum also stated that "a separate issuance" would address the GME payment to these hospitals in prior periods, with the implication being that these hospitals could still receive the special GME payment for services furnished in prior years even if they did not timely submit claims to the intermediary in accordance with 42 C.F.R. § 424.44.  Id. at 573.  Similar treatment was also afforded by the Secretary to Medicare HMOs that failed to submit the patient encounter data to the fiscal intermediaries on a timely basis and thus may not have received capitated payments properly reflecting all of that data.  See supra n.4.

---

[10]    The Part A claims filing regulation requires that a claim must be submitted to the intermediary "(1) On or before December 31 of the following year for services that were furnished during the first 9 months of a calendar year; and (2) On or before December 31 of the second following year for services that were furnished during the last 3 months of the calendar year."  See 42 C.F.R. § 424.44(a).

The Secretary's failure to provide for similar treatment here is unsupported by a rational explanation and, therefore, must be reversed as arbitrary and capricious agency action. See, e.g., Transactive Corp., 91 F.3d at 237-38.

## IV.    SECOND ISSUE

### DENIAL OF IME AND GME PAYMENTS ATTRIBUTABLE TO RESIDENTS' TRAINING IN  NON-HOSPITAL SETTINGS

### A.    FACTS SPECIFIC TO THIS ISSUE

#### 1.    Legal Authorities and Agency Guidance Regarding IME and GME Payments With Respect to Residents' Training in Non-Hospital Sites

The IME and GME statutes provide that the resident counts for IME and GME must include all residents' time spent training in an approved program in a non-hospital setting (e.g., a physician's office) if two conditions are met:  (1) the residents' time is related to patient care; and (2) the hospital incurs substantially all of the costs of the residents' training in the non-hospital setting.  See 42 U.S.C. §§ 1395ww(h)(4)(E), 1395ww(d)(5)(B)(iv).  There is no dispute in this case about either of those two statutory requirements.

The dispute in this case concerns a third condition, that a hospital must have a written agreement with the "nonhospital site" indicating that the hospital will incur the costs of the residents' training in that setting.  See 42 C.F.R. §§ 413.86(f)(3)-(4) (2002), 412.105(f)(1)(ii)(C) (2002).  This third condition is not prescribed in the statute itself but is found only in regulations governing the count of residents training in a non-hospital setting for GME and IME payment purposes.  See 42 C.F.R. §§ 413.86(f)(3)-(4) (2002), 412.105(f)(1)(ii)(C) (2002).

The Secretary's regulations do not address the required timing of the written agreement. See 42 C.F.R. §§ 413.86(f)(3)-(4) (2002), 412.105(f)(1)(ii)(C) (2002).  When the Secretary first adopted the written agreement requirement in 1989, however, he necessarily intended to permit retroactive written agreements because the 1989 rule was made effective retroactively to

residents' training on or after July 1, 1987.  See 54 Fed. Reg. 40286, 40317 (Sept. 29, 1989).

Further, in a November 2000 letter to Congressman Rangel, the Administrator of CMS clarified

that a post-dated written agreement may be accepted so long as a hospital can establish that it

had "a commitment to incur the training costs before the time that the residents began training"

in the non-hospital setting.  A.R. at 1926.

Subsequently, in the preamble to a final rule promulgated in 2004, the Secretary further

clarified that the written agreement requirement was intended only "to provide an administrative

tool for use by the fiscal intermediaries to assist in determining whether hospitals would incur all

or substantially all of the costs of the training in the nonhospital setting in accordance with

Congressional intent."  See 69 Fed. Reg. 48916, 49179 (Aug. 11, 2004).  The Secretary also

acknowledged that "the regulatory requirements concerning the written agreements may not have

been the most efficient aid to fiscal intermediaries in determining whether hospitals would

actually incur all or substantially all of the costs of the training programs in nonhospital

settings."  Id.  Following the 2004 amendments to the IME and GME regulations, no written

agreement is required at all to count residents' time spent training in a non-hospital setting if a

hospital timely pays for the costs of the residents' training in a non-hospital setting.  See

42 C.F.R. § 413.78(e)(3)(i) (2005).

## 2.    The Disallowances At Issue Here

During the periods at issue, the Hospital rotated residents to non-hospital settings, such as

physicians' offices, as required by the accrediting body for the Hospital's approved internal

medicine residency program.  Pl. Stmt. ¶¶ 26-27.  Residents working at non-hospital sites were

trained under the supervision of teaching physicians who were admitted members of the

Hospital's medical staff.  Pl. Stmt. ¶ 28.  The Hospital employed the residents training in the

program and paid the full amount of their salaries and benefits, and the residents received no

payment or compensation of any kind from the teaching physicians or other entities.  Pl. Stmt. ¶¶ 29-30.

The teaching physicians were not compensated monetarily for their supervision of residents rotating in the non-hospital settings; instead, as members of the Hospital's medical staff, teaching physicians were required to assist in any approved residency program and they were granted clinical admitting privileges at the hospital.  Pl. Stmt. ¶¶ 34-35, 38.  Upon admission to the Hospital's medical staff, each physician executed an agreement to abide by certain terms and conditions that were set forth in the Bylaws of the Medical Staff of the Hospital.  Pl. Stmt. ¶¶ 36-37.

Until it excluded the resident time at issue in this case, the Secretary's fiscal intermediary had consistently included resident time spent in non-hospital settings in the Hospitals' resident counts for all prior years.  Pl. Stmt. ¶ 39.  Beginning with its final payment determination for the Hospital's fiscal year 1999, which was issued August 30, 2002 - long *after* the latest cost reporting period at issue had already ended - the fiscal intermediary determined that the Hospital did not have adequate written agreements in place with the teaching physicians concerning the costs of the residents' training during their non-hospital rotations.  Pl. Stmt. ¶ 40.

In 2005, in response to the fiscal intermediary's disallowances for the periods at issue, the Hospital and its teaching physicians entered into memoranda of understanding, which restated and clarified the terms of their pre-existing agreement concerning residents' training during rotations to non-hospital settings.  Pl. Stmt. ¶¶ 42-44.  Those memoranda of understanding confirmed their agreement that the Hospital bears all or substantially all of the costs of the residents' training during rotations to the physicians' offices or clinics, and they also confirmed the agreement that clinical privileges and other rights granted to the physicians under the

Medical Staff Bylaws constitute fair and reasonable in-kind compensation for their supervision of residents during rotations to non-hospital settings.  Id.

The Hospital timely appealed the intermediary's disallowances to the Board.  The Board ruled that residents' rotations to non-hospital sites should be excluded on the grounds that the Hospital did not have a written agreement in place with the non-hospital sites at the time of the residents' rotations at the non-hospital sites.  A.R. at 39-41.  In a two-sentence discussion, the Administrator summarily affirmed the Board's decision.  A.R. at 2.

## B.    ARGUMENT

The Secretary's denial of IME and GME payments with respect to residents' training in non-hospital settings is invalid and should be set aside for at least three reasons.[11]  First, the Secretary's application of the written agreement requirement is inconsistent with the plain meaning and manifest intent of the statutory provisions *requiring* the Secretary to include *all* residents' time spent training in non-hospital settings in the IME and GME payment, so long as two statutory conditions precedent are met, neither of which is at issue in this case.  42 U.S.C. §§ 1395ww(h)(4)(E), 1395ww(d)(5)(B)(iv).   Further, the Secretary's refusal to accept the Hospital's post-dated memoranda of understanding with the physicians who supervised the residents when training in non-hospital sites conflicts with the plain language and intent of the regulations setting forth the written agreement requirement.   42 C.F.R.  §§ 413.86(f)(3)-(4) (2002), 412.105(f)(1)(ii)(C) (2002).   Finally, the Secretary's refusal to accept the Hospital's memoranda of understanding with the physicians also is not based upon substantial evidence in

---

[11]    After the time periods at issue in this case, the Secretary amended the IME and GME regulations so as not to require a written agreement so long as a hospital timely incurs and pays the costs of residents' training in a non-hospital setting.  See 42 C.F.R. § 413.78(e)(3)(i) (2005). In doing so, the Secretary recognized that "the regulatory requirements concerning the written agreements may not have been the most efficient aid to fiscal intermediaries in determining whether hospitals would actually incur all or substantially all of the costs of the training programs in nonhospital settings."  69 Fed. Reg. at 49179.

the record, and is inconsistent with agency precedent interpreting the written agreement requirement.

### 1.    The Secretary's Application of His Written Agreement Requirement Violates the Medicare Statute

In contravention of the plain language and manifest intent of the statute, see 42 U.S.C. §§ 1395ww(h)(4)(E), 1395ww(d)(5)(B)(iv), the Secretary's regulations as applied in this case provide that training time spent in a non-hospital setting will *not* be counted, even if the two statutory conditions were met (as they were here), unless a hospital also satisfies a third additional requirement for a written agreement. The Secretary's decision, therefore, should be set aside because it is inconsistent with the plain meaning and manifest intent of the GME and IME statutes.

Undoubtedly, the Secretary will urge the Court to follow the decision issued in Chestnut Hill Hosp. v. Thompson, No. 04-1128, 2006 WL 2380660 (D.D.C. Aug. 15, 2006), appeal dismissed per stipulation of settlement sub nom. Chestnut Hill Hosp. v. Leavitt, No. 06-5303, 2007 WL 2198570 (D.C. Cir. July 13, 2007). The decision in that case, however, is not controlling here. In that case, the district court did not have the benefit of the Secretary's interpretation of his regulations as set forth in the 2000 letter to Congressman Rangel. A.R. at 1926. Further, as shown below, the Secretary's application of his written agreement requirement is beyond the agency's statutory authority.

As discussed above, when Congress originally enacted the GME statute in 1986, it granted the Secretary broad authority to promulgate rules, "consistent with this paragraph," governing the resident count for GME payment purposes. See Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA '85"), Pub. L. No. 99-272, § 9202. The "paragraph" referenced in the 1986 legislation is the paragraph now codified at 42 U.S.C. § 1395ww(h)(4).

Shortly after enacting this provision, Congress became aware that the Secretary was not allowing hospitals to be reimbursed for residents' training in non-hospital settings.  H.R. Rep. No. 99-727, at 70 (1986), reprinted in 1986 U.S.C.C.A.N. 3607, 3660.  In response, and desiring to promote residents' training in primary care medicine, Congress amended paragraph (4) in subsection 1395ww(h) and significantly curtailed the Secretary's authority to promulgate rules with respect to residents' training in non-hospital settings.  See Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9314(a); see also H.R. Rep. No. 99-727, at 69-70 (1986), reprinted in 1986 U.S.C.C.A.N. 3607, 3659-60.  As amended, section 1395ww(h)(4)(E) requires that the Secretary's rules for determining the resident count for GME "shall provide" that "all the time" spent training in a non-hospital setting "shall be counted" if two conditions are met.  The full text of this portion of the statute states, in pertinent part:

> (A) *Rules*.  The Secretary shall establish rules consistent with this paragraph for the computation of the number of full-time-equivalent residents in an approved medical residency training program.
> …
>
> (E)  *Counting Time Spent in Outpatient Settings*.  Such rules shall provide that only time spent in activities relating to patient care shall be counted and that all the time so spent by a resident under an approved medical residency training program shall be counted towards the determination of full-time equivalency, without regard to the setting in which the activities are performed, if the hospital incurs all, or substantially all, of the costs for the training program in that setting.

42 U.S.C. § 1395ww(h)(4)(A), (E) (emphasis added).[12]

As the statute makes clear, the Secretary does not have unfettered discretion to promulgate any rule he chooses with respect to the determination of a hospital's number of residents training in a non-hospital setting.   In particular, the statute mandates that the Secretary's rules must be "consistent with" the requirement that the Secretary must count all

---

[12]    Similarly, the IME statute was amended in 1997 to mandate that all residents' time spent training in a non-hospital setting "shall be counted" if the same two conditions are met. 42 U.S.C. § 1395ww(d)(5)(B)(iv).

residents' training in an approved program, without regard to the setting in which the training occurs, so long as the residents are involved in patient care and the hospital incurs substantially all of the costs for the training program in that setting.

Congress' use of the term "shall" in subparagraph (E) of the GME statute quoted above, and in the related provision in the IME statute, reflects Congress' intent to require the Secretary to count "all" the time spent rotating to non-hospital sites, so long as the Hospital meets the two requirements enumerated in the statute. See e.g., County of Los Angeles v. Shalala, 192 F.3d 1005, 1018 (D.C. Cir. 1999) (finding that Congress' use of "shall" meant that Congress had established a mandatory duty for the Secretary rather than a discretionary guideline); Ass'n of Civilian Technicians, Montana Air Chapter No. 29 v. Federal Labor Relations Authority, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.") (emphasis in original).

Indeed, the controlling provisions in the GME statute (§ 1395ww(h)(4)(E)) and the IME statute (§ 1395ww(d)(5)(B)(iv)) contain no discretionary language at all, and this stands in stark contrast with the wide discretion otherwise granted to the Secretary to promulgate rules governing the determination of a hospital's allowable number of residents training in approved programs. From this we can safely presume that Congress intended to limit the Secretary's discretion with respect to residents' training in non-hospital settings. Cf. Motion Picture Ass'n of Am., Inc. v. FCC, 309 F.3d 796, 802 (D.C. Cir. 2002) (when Congress grants an agency general rulemaking authority in one section of a statute, but not another, it is presumed that Congress intended to limit an agency's discretion in the latter provision). And, from there, we must conclude that the Secretary's decision in this case exceeds his statutory authority, and should be set aside.

Where Congress, in plainly-worded, mandatory terms, has curtailed a broad delegation of authority to the Secretary by *requiring* him to count residents' training in non-hospital settings if two criteria are met, the Secretary cannot interpose a further requirement that hospitals must meet in order to have that training included in the GME and IME payment calculations.  See Sierra Club v. EPA, 719 F.2d 436, 455 (D.C. Cir. 1983) (finding that the EPA's general rulemaking authority does not allow it, in implementing a specific statutory directive, to add new factors to a list beyond those specified in the statute).  Indeed, it is well-established that an administrative agency "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of [the agency] in a particular area."  Am. Petroleum Institute v. U.S. EPA, 52 F.3d 1113, 1119 (D.C. Cir. 1995). Yet that is exactly what the Secretary has done here.

In short, the Secretary's application of his written agreement requirement in this case is contrary to the plain meaning and manifest intent of the Medicare statute, and must be reversed. The Secretary's decision in this case *permits* the Secretary to do the very thing that Congress amended the statute to *prohibit* the Secretary from doing.

### 2.    The Regulation that the Secretary Relies Upon Does Not Require a Prospective Written Contract

Even assuming arguendo that the Secretary may properly impose a requirement for a written agreement with a non-hospital "site" as a further condition precedent to counting residents' training in that setting, the Secretary's regulations do not, and never were intended to, require a hospital to have a written agreement in place at the time of a resident's training in a non-hospital site.  See 42 C.F.R. §§ 413.86(f)(4)(ii) (2002), 412.105(f)(1)(ii)(C) (2002).  Nothing in the text of the IME and GME regulations suggests that a written agreement "must be in place at the time of the non-provider setting rotations," as the Secretary's Board found in this case.

A.R. at 40. As contrasted with the Secretary's use of the term "contract" in other payment regulations, and construed in accordance with its usual meaning, the term "agreement" may encompass an agreement as to both past and future obligations. This is the meaning that the agency itself has given to the written agreement requirement in the GME and IME regulations at issue, and the Secretary's departure in this case from that established agency precedent is arbitrary, capricious and otherwise contrary to law.

When the Secretary first adopted the written agreement requirement in 1989, the agency necessarily accepted retroactive agreements made effective as to residents' training in non-hospital settings beginning more than two years earlier, in July 1987. See 54 Fed. Reg. 40286, 40317 (Sept. 29, 1989). The 1989 regulation was not, and could not reasonably have been, intended to require hospitals to have had such written agreements "in place" before the requirement was first adopted in 1989. That would have subjected teaching hospitals to an impossible requirement, arising in 1989, to have had written agreements in place as early as July 1, 1987, and that was not the intent of the rule at that time. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (stating that an agency's interpretation of its own regulation must be reversed when it is inconsistent with the plain language of the regulation or when it is inconsistent with the agency's statement of intent when it originally adopted the requirement); Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142, 152-55 (3rd Cir. 2004) (concluding that the Secretary's construction of another aspect of his GME regulations is arbitrary and capricious based, in part, on the court's finding that the Secretary's interpretation had shifted over time).

Neither the CMS Administrator (in his two sentence discussion of this issue) nor the Board gave any consideration in their decisions in this case to the Hospital's point that there is no requirement in the regulations for a prospective contract with a non-hospital site in which

residents train.  <u>See</u> A.R. at 2, 39-41.  According to the Board, "[t]he crux of the issue" is whether the Hospital satisfied the regulation's requirements, but the Board all but ignored what the regulation actually requires and what it does not require.  A.R. at 40.  Instead, the Board read into the regulation - *without explanation* - a requirement that is not there, namely that the Hospital must have a written agreement in place at the time of the residents' training in a non-hospital setting in order to include that training time in the IME and GME payment calculations. A.R. at 40.

As noted earlier, the agency itself has not interpreted the IME and GME regulations to require a hospital to have a written agreement in place before a resident's rotation to a non-hospital setting.  Unlike other Medicare reimbursement regulations,[13] the IME and GME regulations at issue do not require a "contract" and certainly do not require a contract executed in advance.  <u>Compare</u> 42 C.F.R. § 413.134(a)(3)(ii)(D) (requiring "a valid written contract [] entered into by a provider participating in the program before February 5, 1970") <u>with</u> 42 C.F.R. § 413.86(f)(3)-(4) (2002) (requiring a "written agreement" between hospital and non-hospital site).  The term "agreement," as used in other Medicare reimbursement regulations,[14] and as construed in the former CMS Administrator's letter to Congressman Rangel (A.R. at 1926), is generally defined as a "broader term" concerning either "past or future performances."  <u>Black's Law Dictionary</u> 74 (8th ed. 2004).  As acknowledged in the Administrator's letter to Congressman Rangel (A.R. at 1926), and in the preamble to the Secretary's later amendments to

---

[13]     <u>See, e.g.</u>, 42 C.F.R. § 412.105(g) (2002) (regarding IME payments for services furnished to enrollees in a Medicare HMO with a "risk-sharing contract"); 42 C.F.R. § 413.86(d)(3) (2002) (regarding GME payments for services furnished to enrollees "under a risk-sharing contract").

[14]     All providers of services participating in the Medicare program must have a "provider agreement" with the Secretary, for example, which may be made effective retroactively up to one year prior to the date of execution.  42 C.F.R. § 489.13(d)(2).

the GME and IME rules, 69 Fed. Reg. at 49179, the written agreement requirement was never intended to be anything more than an "administrative tool" to assist intermediaries in documenting that a hospital met the statutory requirement to incur all or substantially all of the cost of residents' training in non-hospital settings.   And, it is well-established under agency precedents that non-contemporaneous documentation is acceptable to support a hospital's compliance with applicable program requirements.   For example, in Barnes Hospital, the Administrator of CMS accepted a 1992 agreement to document that a $7.8 million payment made by a hospital in 1984, in the form of a profit-sharing payment under the terms of a 1964 profit sharing agreement, was in substance a payment for teaching physicians' supervision and instruction of residents.   Barnes Hospital v. Mutual of Omaha, HCFA Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 42,592 (July 5, 1994).   In Barnes, the Administrator concluded that the 1992 agreement, though executed eight years after the 1984 period at issue, provided acceptable evidence of the parties' actual intent in 1984:

> While the 1964 Agreement does not provide for specific payment to the University for teaching services, the record indicates that the parties executed a new agreement in 1992.  This 1992 Agreement was substituted for the 1964 Agreement and provides evidence of the parties' practical interpretation that the 1964 Agreement required payment for teaching services.

Id.   Similarly, in Washington Hospital Center, the Secretary upheld the PRRB's finding that a 1987 study adequately supported the usage of a hospital's cafeteria, and the allocation of its cafeteria costs incurred, over a five-year period that began 10 years earlier.   Washington Hosp. Ctr. v. Mutual of Omaha, HCFA Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 36,850 (Feb. 4, 1988).

In this case, neither the Administrator nor the Board provided any rational explanation for the contrary application of the IME and GME regulations at issue in this case.  Indeed, the Board provided no real explanation at all for its decision on this point.  On the one hand, the Board

concluded that the Hospital's evidence of its contemporaneous commitment to incur the costs of residents' training in non-hospital settings "does not demonstrate the commitment referenced in the [Administrator's] letter" to Congressman Rangel. A.R. at 41. But, on the other hand, the Board admitted that it did not know "what the Administrator may have found acceptable in that particular instance." A.R. at 41. In the end, the Board simply reverted to prior position, see A.R. at 40, that a contemporaneous agreement is required in all cases, concluding that it did not "find the argument persuasive" that subsequent written instruments, like the memoranda of understanding in the record in this case, "are sufficient as long as a 'hospital can document that there was a commitment to incur the training costs before the time the residents began training [at the non-hospital site].'" A.R. at 41. And the Administrator's decision, which summarily affirmed the Board's decision on this issue, adds no saving grace to the Board's arbitrary decision.

At bottom, the Board's categorical requirement for what amounts to a *prospective* written contract is categorically wrong and otherwise unreasonable. See 69 Fed. Reg. at 49179 (acknowledging that the written agreement requirement "may not have been the most efficient aid to fiscal intermediaries in determining whether hospitals would actually incur" substantially all of the cost of residents' training in non-hospital settings). Moreover, there can be no genuine dispute based on the record evidence that the Hospital demonstrated that it had a "commitment to incur the training costs before the time that the residents began training" at the non-hospital sites during the cost reporting periods at issue.

There is no dispute that the determination of the cost of residents' training in a non-hospital setting is "a matter between the hospital and non-hospital [site]." See 63 Fed. Reg. 40954, 40993 (July 31, 1998); see also Program Memorandum (Intermediaries), HCFA Pub.

60A, Trans. No. A-98-44 (Dec. 1, 1998), Medicare & Medicaid Guide (CCH) ¶ 150,171 ("Program Memorandum A-98-44"), A.R. at 1869 (stating that "[t]he determination of what constitutes reasonable compensation is a matter between the hospital and nonhospital site…. We do not expect fiscal intermediaries to do a detailed cost finding as to each party's respective costs."). Nor is there any dispute that a hospital may provide non-monetary, in-kind consideration for physicians' supervision and instruction of residents who are training in a non-hospital setting, and the value of such in-kind consideration need not be identified in an agreement between the parties. See 63 Fed. Reg. at 40993; see also Program Memorandum A-98-44. Additionally, it is not disputed that teaching physicians may volunteer their teaching services to a hospital. 63 Fed. Reg. at 40996; 64 Fed. Reg. 41490, 41517-18 (July 30, 1999).

In this case, the undisputed evidence shows that the Hospital had contemporaneous employment agreements in place with all of the residents and that the Hospital incurred the full costs of the residents' salaries and benefits, including the salary and benefits costs of their training in non-hospital sites. Pl. Stmt. ¶¶ 29-30. Further, the undisputed evidence shows that there were only minimal if any costs associated with the teaching physicians at the non-hospital site.[15] Pl. Stmt. ¶¶ 32-33. And to the extent that there were any costs of this instruction, the teaching physicians were compensated in-kind through the provision of clinical privileges at the Hospital granted to them under the Medical Staff Bylaws in part for their agreement to participate in the Hospital's residency training programs. Pl. Stmt. ¶¶ 35-38. Moreover, even if that in-kind consideration were inadequate, there is no dispute that the physicians were permitted

---

[15]    In 2005, the Hospital conducted a survey of teaching physicians to determine what amount of time, if any, they spent in educational activities or other administrative activities relating to the residents' training but unrelated to patient care activities. Pl. Stmt. ¶ 33. The responses showed that physicians work an average of 50 hours per week but spend less than 3 hours of that amount is attributable to education activities or administrative tasks related to residents' training but unrelated to the care of an individual patient. Id.

to volunteer their teaching services to the Hospital under the rules in effect during periods at issue.  See 63 Fed. Reg. at 40996; 64 Fed. Reg. at 41517-18.

Finally, the undisputed record evidence shows that in 2005, the Hospital and the teaching physicians on its medical staff executed memoranda of understanding for the purpose of "reiterat[ing] and confirm[ing] the terms of [their] agreement for [the teaching physicians'] continued participation in [the Hospital's] intern and resident training programs.  A.R. at 997; Pl. Stmt. ¶ 42.  In addition, the memoranda of understanding restated and confirmed the parties' agreement that the clinical privileges and other rights granted to the physicians under the Medical Staff Bylaws constitute fair and reasonable in-kind compensation for the supervision and instruction of interns and residents during their rotations to the preceptors' offices.  Pl. Stmt. ¶ 44.  These post-dated agreements, coupled with the Hospital's additional evidence of its contemporaneous commitment to incur the costs of the residents' training in the non-hospital settings during the periods at issue, fully satisfy the plain language and intent of the IME and GME regulations.  Accordingly, the Secretary's decision in this case should be reversed.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its motion for summary judgment.  A proposed order is attached.

Respectfully submitted,


/s/ Christopher L. Keough
Christopher L. Keough
 DC Bar No. 436567
J. Harold Richards
 DC Bar No. 469524
KING & SPALDING L.L.P.
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006-4706
202.737.0500 (phone)
202.626.3737 (fax)

Counsel for Plaintiff

Dated:  July 11, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COTTAGE HEALTH SYSTEM, d/b/a          )
SANTA BARBARA COTTAGE HOSPITAL,       )
                                      )
          Plaintiff,                  )    Case No.: 1:08-cv-00098 (JDB)
                                      )
     v.                               )
                                      )
MICHAEL O. LEAVITT, Secretary         )
     United States Department of      )
     Health and Human Services,       )
                                      )
          Defendant.                  )
_____ )

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Rule 7(h) and 56.1 of this Court, Plaintiff respectfully submits the following statement of material facts as to which there is no genuine issue:

**I.    PARTIES**

1.    Plaintiff Cottage Health System is a not-for-profit corporation that owns and operates Santa Barbara Cottage Hospital, in Santa Barbara, California. Santa Barbara Cottage Hospital (the "Hospital") participates in the Medicare program as a "provider of services" under Medicare provider number 05-0396. Complaint and Answer ¶ 13.

2.    Defendant Michael O. Leavitt, Secretary of the United States Department of Health and Human Services ("HHS"), is the federal officer to whom Congress has delegated administration of the Medicare program. Complaint and Answer at ¶ 14. References to the Secretary herein are meant to refer to him, his subordinates, and to his official predecessors or successors as the context requires.

3.      The Centers for Medicare and Medicaid Services ("CMS") is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program.  At some times relevant to this case, CMS was known as the Health Care Financing Administration. Complaint and Answer ¶ 15.  References to CMS herein are meant to refer to the agency and its predecessors.

4.      The Secretary contracts with private organizations known as "fiscal intermediaries" or "intermediaries" to make determinations of the amounts payable to providers for services furnished to Medicare beneficiaries.  See 42 U.S.C. §1395h(a); Administrative Record ("A.R.") at 26.

## II.      NATURE OF THE CASE AND PROCEDURAL HISTORY

5.      The periods at issue are the Hospital's cost reporting periods ending December 31, 1998; December 31, 1999; December 31, 2000; and December 31, 2001.  Complaint and Answer ¶ 30.

6.      The Hospital timely appealed the Medicare fiscal intermediary's final determinations denying direct graduate medical education ("GME") and indirect medical education ("IME") payments for each of the cost-reporting periods at issue to the Provider Reimbursement Review Board ("PRRB" or "Board").  See A.R. at 2544-71, 2932-69, 3517-45, 3758, 4410-40.

7.      In its appeals to the Board, the Hospital presented two challenges to the Medicare fiscal intermediary's final payment determinations regarding the IME and GME payments due the Hospital for the cost reporting periods at issue.  See id.; see also A.R. at 25-48.

8.      The Hospital first challenged the Secretary's denial of GME and IME payments for services furnished to Medicare beneficiaries who were enrolled in (i) a health maintenance organization or competitive medical plan with a Medicare risk sharing contract under section 1876

of the Social Security Act or (ii) a Medicare+Choice plan under Part C of the Social Security Act. For ease of reference, all of these plans are referred to herein as "Medicare HMOs."

9.      The Hospital also challenged the fiscal intermediary's denial of GME and IME payments based on its exclusion of Hospital residents training in non-hospital settings from the GME and IME payment calculations.  See id.

10.      The PRRB issued a written decision, dated September 28, 2007, in the Hospital's appeals for fiscal years 1998, 1999, 2000 and 2001.  A.R. at 25-48.

11.      In its decision, the PRRB reversed the intermediary's denial of IME and GME payments for services furnished to Medicare HMO enrollees and affirmed the intermediary's denial of payment with respect to residents' time in non-hospital settings.  Complaint and Answer ¶ 37; see also A.R. at 39, 41.

12.      Upon review of the PRRB decision, the Deputy Administrator of CMS reversed the Board's decision in the Hospital's favor regarding IME and GME  payments for services furnished to Medicare HMO enrollees and summarily affirmed the Board's decision denying payments with respect to residents' training in non-hospital settings.  Complaint and Answer ¶ 38; see also A.R. at 16-17.

13.      The Deputy Administrator's decision was sent to the Hospital's counsel under cover of a letter dated November 21, 2007.  Complaint and Answer ¶ 40.

14.      The Deputy Administrator's decision constitutes the Secretary's final determination on the two issues in dispute for the cost reporting periods at issue.  Complaint and Answer ¶ 39.

## III.    FACTS SPECIFIC TO DENIAL OF GME AND IME PAYMENTS FOR MEDICARE HMO ENROLLEES

15.    By letter dated July 17, 1998, the Hospital requested guidance from the Secretary's fiscal intermediary on implementation of the provisions of the Balanced Budget Act of 1997 providing for GME and IME payments for services furnished to Medicare HMO enrollees.  A.R. at 517.

16.    The intermediary responded to the Hospital's inquiry by letter dated August 20, 1998. A.R. at 519.    The intermediary stated that unspecified "[s]ystem changes" and "system enhancements" were needed to fully implement the GME and IME payments for Medicare HMO enrollees.  Id.  The letter did not indicate when these modifications would occur but simply referenced the intermediary's newsletter, "Medicare Bulletin 416," which was issued in July 1998. Id.; see also A.R. at 521.

17.    Under cover of a letter dated November 2, 2000, the Hospital furnished the intermediary with encounter data for the Hospital's Medicare patients who were enrolled in a Medicare HMO during the Hospital's cost reporting period ending December 31, 1998.  A.R. at 326-404.

18.    The Hospital's November 2, 2000, letter advised the intermediary that the Medicare HMO patient encounter data had been recorded on Medicare UB-92 forms that were timely submitted to, and paid by the Medicare HMOs, and that the UB-92 forms would be available for the fiscal intermediary's review during its later audit of the Hospital's cost report for 1998.  See A.R. at 326, 406.

19.    After completion of the audit, the fiscal intermediary accepted the Hospital's HMO patient data and incorporated it into a Notice of Program Reimbursement ("NPR") dated September 28, 2001, for the Hospital's 1998 cost reporting period.  See A.R. at 409, 413-14, 4416-17.

20.     Subsequently, in a revised NPR dated February 14, 2003, the fiscal intermediary amended the Hospital's cost report for fiscal year 1998 and removed the Medicare HMO patient data See A.R. at 416, 641-42.  The fiscal intermediary did not include any Medicare HMO patient data in its revised NPR for the Hospital's 1998 cost reporting period.  A.R. at 416; see also Complaint and Answer ¶ 103.

21.     By letter dated March 27, 2002, the Hospital furnished the fiscal intermediary with its Medicare HMO patient data  for its fiscal year 1999.  A.R. at 409; see also A.R. at 418-61.

22.     The Hospital's March 27, 2002, letter stated: "We have been working with [the fiscal intermediary's] office to find out why these senior HMO days are not getting into [the intermediary's data in a report called] the PS&R.  During the audit of FY1998, [the intermediary's] staff incorporated this information at the time of audit.  For FY 1999, again this information was not in the PS&R."  A.R. at 409.

23.     The March 27, 2002, letter further advised the fiscal intermediary that all of the "Senior HMO" encounter data for the Hospital's 1999 cost reporting period "have been logged from the UB92 that we sent the [Medicare HMO] plans" and that the Hospital had copies of the UB-92 form for each case available for the intermediary's review in its later audit.  See id.; see also A.R. at 463-65.

24.     By letter dated June 10, 2003, the Hospital furnished the fiscal intermediary with its Medicare HMO patient data for fiscal year 2000, and again requested that this data be included in the intermediary's final determination of the amounts due the Hospital for its 2000 cost reporting period.  A.R. at 467-515.

25.     In NPRs issued in 2002 and later, the intermediary refused to accept or include the Hospital's Medicare HMO patient data in its final IME and GME payment determinations for the 1999-2001 cost reporting periods at issue.  Complaint and Answer ¶ 103.

## IV.     FACTS SPECIFIC TO DENIAL OF GME AND IME PAYMENTS WITH RESPECT TO RESIDENTS TRAINING IN NON-HOSPITAL SETTINGS

26.     The Hospital has three medical residency training programs, including an internal medicine program that is accredited by the Accreditation Council on Graduate Medical Education ("ACGME").  Complaint and Answer ¶ 116; A.R. at 156.  The ACGME requires that at least one third of the residents' training in an approved internal medicine program occur in physician offices and other ambulatory care settings outside of the Hospital.  Complaint and Answer ¶ 117; see also A.R. at 156-57, 668.

27.     The internal medicine residency program began in 1977, and since its inception, it has included rotations outside the hospital setting to physician offices and clinics.  A.R. at 156.

28.      The Hospital's residents spent time training in non-hospital settings under the supervision of teaching physicians in the community, known as "preceptors," who are admitted members of the Hospital's medical staff.  Complaint and Answer ¶ 118; see also A.R. at 156.

29.     The Hospital had employment contracts with each of the residents and paid the full amount of their salaries and benefits, including the compensation costs attributable to their training in non-hospital settings.  Complaint and Answer ¶ 119; see also A.R. at 160, 1049-1856.

30.     The residents received no payment or other compensation of any kind from the teaching physicians or other entities.  Complaint and Answer ¶ 120; A.R. at 160.

31.     The residents' instruction during their rotations to non-hospital settings followed an apprenticeship model.  Complaint and Answer ¶ 121; A.R. at 157.

- 6 -

32.    During their rotations in non-hospital settings, each resident typically worked with a teaching physician, who either saw patients right after a resident saw them, or jointly examined the patient together with the resident.  The teaching physicians were not required or expected to give lectures or engage in any other didactic activities to meet curriculum requirements during residents' rotations to non-hospital settings.  Complaint and Answer ¶ 122; A.R. at 158.  In addition to allowing residents to participate in the diagnosis and treatment of patients, teaching physicians were expected to complete a short evaluation at the end of the residents' rotations.  A.R. at 160, 791-93.

33.    The teaching physicians spent substantially all of their time in patient care activities while supervising residents during their rotations to non-hospital settings.  A.R. at 158-60.  In 2005, the Hospital surveyed the teaching physicians to determine what amount of time, if any, is spent teaching or performing other administrative tasks relating to the residents' training but unrelated to patient care activities.  A.R. at 158, 795-883.  The responses showed that physicians work an average of 50 hours per week, and for periods when they are supervising residents, an average of less than three hours per week (6% of the total) are attributable to educational activities or other administrative tasks related to residents' training but unrelated to the care of an individual patient. A.R. at 160, 795-883.

34.    The teaching physicians were not compensated monetarily for their supervision of the residents during residents' rotations to the non-hospital settings at issue.  Complaint and Answer ¶ 124; see also A.R. at 161-62.  The teaching physicians were compensated based solely on the revenues generated from their patient care services.  A.R. at 162.

35.    The teaching physicians receive in-kind consideration from the Hospital for their teaching services.  Every teaching physician supervising the Hospital's residents during rotations to non-hospital sites is a member of the Hospital's medical staff.  A.R. at 161, 163.

- 7 -

36.    Upon admission to the Hospital's medical staff, each physician executes an agreement to abide by certain terms and conditions, as set forth in the Bylaws of the Medical Staff of the Hospital.  Complaint and Answer ¶ 127; see also A.R. at 163, 885-995.

37.    As admitted members of the Hospital's medical staff, the teaching physicians were required to, among other things, "aid[] in any medical staff approved educational programs for medical students, interns, resident physicians, resident dentists, staff physicians and dentists, nurses and other personnel."  Complaint and Answer ¶ 125; A.R. at 899.

38.    As admitted members of the Hospital's medical staff, the physicians also were granted clinical admitting privileges at the Hospital.  Complaint and Answer ¶ 126; A.R. at 161. None of the teaching physicians has ever claimed to be dissatisfied with the compensation received for their supervisory teaching activities.  A.R. at 161.

39.    Until it effected the adjustments at issue, the Secretary's fiscal intermediary had consistently counted residents' time spent in non-hospital settings in the resident counts used to determine the Hospital's payments for GME and IME.  A.R. at 163.

40.    The fiscal intermediary first excluded the residents' time spent training in non-hospital settings in an NPR dated August 30, 2002, for the Hospital's cost reporting period ending December 31, 1999.  See A.R. at 644-45.  The intermediary determined that the Hospital did not have adequate written agreements in place with the teaching physicians concerning residents' training in non-hospital sites during this cost reporting period.  Complaint and Answer ¶ 130.

41.    The fiscal intermediary subsequently issued determinations that excluded the residents' time spent training in non-hospital settings for the Hospital's cost reporting periods ending December 31, 1998; December 31, 2000; and December 31, 2001.  See A.R. at 641-42, 647-48, 2303-2304.

42.     In response to the intermediary's determinations for the periods at issue, the Hospital and the teaching physicians on its medical staff in 2005 entered into memoranda of understanding which restated and clarified the terms of their pre-existing agreement concerning residents' training during their rotations to non-hospital settings.  A.R. at 163, 997-1028.

43.     The memoranda of understanding confirm the agreement that the Hospital bears substantially all of the costs of the residents' training during rotations to the physicians' offices or clinics.  See A.R. at 997-1028.

44.     The memoranda of understanding also confirm the agreement that clinical privileges and other rights granted to the physicians under the Medical Staff Bylaws constitute fair and reasonable in-kind compensation for the supervision and instruction of interns and residents during their rotations to non-hospital settings.  See A.R. at 163, 997-1028.

Respectfully submitted,

/s/ Christopher L. Keough
Christopher L. Keough
  DC Bar No. 436567
J. Harold Richards
  DC Bar No. 469524
KING & SPALDING L.L.P.
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006-4706
202.737.0500 (phone)
202.626.3737 (fax)

Counsel for Plaintiff

Dated:  July 11, 2008

- 9 -

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COTTAGE HEALTH SYSTEM, d/b/a SANTA BARBARA COTTAGE HOSPITAL, | ) ) ) |
| Plaintiff, | ) Case No.: 1:08-cv-00098 (JDB) ) |
| v. | ) ) |
| MICHAEL O. LEAVITT, Secretary United States Department of Health and Human Services, | ) ) ) ) |
| Defendant. | ) ) ) |

**<u>PROPOSED ORDER</u>**

Upon consideration of the parties' cross-motions for summary judgment and the memoranda in support of the motions, it is hereby:

ORDERED that plaintiff's motion be, and hereby is, GRANTED; and it is

FURTHER ORDERED that defendant Leavitt's motion be, and hereby is, DENIED; and it is

FURTHER ORDERED that defendant's decision issued by letter dated November 21, 2007, denying all GME and IME payments to plaintiff for services furnished to Medicare HMO enrollees in for the plaintiff's fiscal years 1998-2001 be, and hereby is, reversed and set aside; and it is

FURTHER ORDERED that defendant's decision issued by letter dated November 21, 2007, affirming the Provider Reimbursement Review Board's decision denying all GME and IME payments with respect to medical residents' training in non-hospital settings be, and hereby is, reversed and set aside; and it is

FURTHER ORDERED that defendant shall pay plaintiff, within 60 days of the date of this Order, the additional GME and IME amounts due for services furnished to Medicare HMO enrollees and the additional GME and IME payments due as a result of including all residents' training in non-hospital settings in the IME and GME payment calculations for plaintiff's fiscal years 1998-2001, plus interest calculated in accordance with  42 U.S.C. § 1395oo(f)(2).

SO ORDERED, this the _____ day of _____, 2008.

_____
The Honorable John D. Bates
United States District Judge